**Cheryl J. JONES, Plaintiff–Appellee,**

v.

**JONES BROTHERS CONSTRUCTION CORPORATION,
Defendant–Appellant.**

No. 88–2833.

United States Court of Appeals,
Seventh Circuit.

Argued May 25, 1989.

Decided July 20, 1989.

As Amended July 24, 1989.

Steven Shobat, Office of the U.S. Atty., Stephan A. Glickman, John L. Gubbins, Gubbins & Associates, Chicago, Ill., for plaintiff-appellee.

Brian W. Bulger, Katten, Muchin & Zavis, Chicago, Ill., for defendant-appellant.

Before WOOD, Jr., COFFEY and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

This case illustrates the difficulties that result when an arguably appropriate judgment is entered but is not supported by adequate findings of fact and law as required by Fed.R.Civ.P. 52(a). The suit is a gender discrimination case brought under Title VII, 42 U.S.C. § 2000e, *et seq.* The district judge, after a bench trial, awarded judgment in favor of the plaintiff/employee, finding that she had been discharged by her employer because of her sex. On appeal, the employer contends that the district court's finding of discrimination was clearly erroneous. Because of the inadequacy of the findings entered below, however, we are unable to appropriately review the issue, and we therefore remand for further findings.

I.

The undisputed facts are as follows. Cheryl Jones brought suit against her former employer, Jones Brothers Construction Corp., alleging gender discrimination under Title VII and religious discrimination under both Title VII and 42 U.S.C. § 1981. After a six-day bench trial, the district court found in favor of plaintiff on the Title VII gender discrimination claim and rejected her religious discrimination claims. Jones Brothers appeals the finding of gender discrimination; the plaintiff does not cross-appeal the adverse ruling on her religious discrimination claims.

Jones Brothers is a construction company which contracted with American Airlines to renovate American's terminal at O'Hare Airport. In June 1985, the general superintendent of Jones Brothers, Robert Sanders, hired plaintiff as a laborer-escort on the O'Hare project. Her laborer duties included breaking out walls with an airhammer, ditch digging, breaking up material with a sledge-hammer, operating a jackhammer, manipulating the chute of a concrete truck, and shoveling gravel. Plaintiff's escort duties entailed escorting workers and materials suppliers onto and off of the airport job site; the escorts drove a truck and were armed with a two-way radio and a permit which allowed them to escort vehicular traffic on the airport premises. At the time plaintiff was hired there were four laborer-escorts, all of whom were women.

During Sanders' tenure as general superintendent, which ran until July 1986, plaintiff was never disciplined or reprimanded in any way. She took her daily assignments from Sanders or another foreman. In addition to her laborer and escort duties, Sanders and the foreman routinely sent plaintiff off the airport grounds on work-related errands such as picking up materials and supplies. In June 1986, Sanders assigned plaintiff to supervisor Jerry Rush for her daily assignments.

In July 1986, Jones Brothers fired Sanders and replaced him with Walter Nealey.

Shortly thereafter, Nealey hired several new superintendents and foremen, many of whom Nealey knew from his former job at Pepper Construction Company. Among these former co-workers was John Oxford, whom Nealey hired as the laborer foreman.

There is little agreement between the plaintiff and the defendant as to what ensued, and the district court's opinion fails to resolve most of the factual disputes. We will briefly summarize the parties' positions at trial. Jones Brothers contended as follows. Shortly after Oxford was hired, he and Nealey met with all the laborer-escorts and informed them that Oxford was their new supervisor, that they should report to him, that their primary duty was to perform escort work, that they were not to leave the airport premises without permission from Oxford or Nealey, and that they were to carry their radios at all times including breaks. Oxford subsequently informed supervisor Rush of the new rules. Thereafter, certain employees complained that plaintiff arrived for work late and left early, that she was not available by radio, that the other escorts' work was thereby increased, and that plaintiff left the airport premises without permission. Plaintiff was repeatedly reprimanded. Thereafter, the renovation project changed so that four escorts were no longer needed. Because plaintiff was the least competent of the four, she was discharged.

Plaintiff contended as follows. Nealey, an adherent to the Jehovah's Witness faith, believed women were submissive to men and desired to remove women from laborer positions. He (and/or Oxford) hired numerous male laborers, many of whom were also Jehovah's Witnesses, fired three of the six women who had been hired by Sanders, and did not hire or make any effort to hire any women while he was general superintendent despite Jones Brothers' affirmative action goals. During Nealey's tenure, the four women escorts were subjected to derogatory language based on gender both in person and over the truck radio system. The total number of female laborer hours at Jones Brothers dropped while overall laborer hours increased. After Oxford was hired, neither she nor Rush were told of

the new rules. She continued to report to Rush, who assigned her to laborer tasks and sent her off the airport grounds on work-related errands. Her performance as both a laborer and an escort was satisfactory, she did not arrive late or leave early, and, with the exception of one incident, she was never reprimanded. The incident occurred one day when Rush had sent her off-grounds to pick up some lumber. Oxford noticed her off-grounds and confronted her, whereupon she informed him that she had never been notified of any policy requiring his or Nealey's permission to leave the grounds but that she would abide by the policy in the future. Plaintiff never again left the grounds through the day of her discharge. No written documentation of any reprimand exists. Neither Nealey or Oxford consulted with Rush or the timekeeper before discharging plaintiff. There had been no slow-down in the terminal renovation work. After her discharge, Oxford assigned male laborers to take over plaintiff's escort duties and added a fifth escort truck.

## II.

■ The district court's opinion makes review difficult because the limited number of specific findings do not sufficiently identify the evidence or credibility determinations upon which they were based and reflect certain inconsistencies. Additionally, the court's conclusions of law are not structured along the lines of the appropriate legal framework. In order to guide the court on remand, we will outline the critical areas.

### A. *Insufficient Factual Findings*

The above summary of the parties' positions at trial generally identifies the major factual disputes. In addition, the parties' briefs in this court point out several specific issues on which findings would be appropriate: (1) whether Nealey and Oxford held a meeting and announced the new rules and whether plaintiff attended that meeting; (2) whether Nealey held a meeting with the supervisors to announce the new

rules; (3) whether Oxford personally informed supervisor Rush of the new rules; (4) whether plaintiff failed to respond to radio calls; (5) credibility determinations as to conflicting testimony, concerning, among other things, plaintiff's tardiness and whether plaintiff was repeatedly reprimanded; and (6) whether similarly situated males were treated more favorably. This list is not intended to be exclusive, but rather points up the need for additional findings and is intended to assist the court on remand.

As to the last point—whether similarly situated males were treated more favorably—the district court stated, "[h]ad four male laborer/escorts been working as escorts when Nealey decided to reduce the number from four to three, he would undoubtedly have merely returned one of them to laborer work." No evidence is cited to buttress this finding, and, as such, the statement is open to the charge of conjecture. On appeal, the parties respectively argue the existence and non-existence of evidentiary support. At this point, we express no opinion as to sufficiency of the evidence and direct the district court to address the issue.

A difficult point, and one on which neither the district court's opinion nor the parties' briefs on appeal are instructive, is whether there was a difference in the amount of laborer work plaintiff performed before and after Nealey's arrival and how that difference, if any, compared to the amount of laborer work the other three laborer-escorts performed before and after Nealey's arrival. In other words, prior to Nealey's arrival, were all four women performing laborer work? After Nealey's arrival, was plaintiff the only one of the four who continued to perform laborer work? Perhaps the evidence adduced at trial does not permit answers to these questions. However, if the evidence in the record supports findings on these issues, such findings should be made, for we believe the answers are highly relevant to the district court's ultimate conclusion that plaintiff was discharged for the discriminatory purpose of removing women from laborer positions.

As to defendant's efforts or lack thereof to hire women, the district court simply stated, "it is not credible to suggest that no women in Chicago would take a job which, with overtime, could pay as much as $35,-000 a year." This constitutes an inadequate finding, apparently grounded on a speculative personal viewpoint. On remand, such credibility determinations must be based solely on the demeanor of the witnesses and the consistencies or inconsistencies in the testimony.

### B. Inconsistent Findings

At trial, there was a great deal of conflicting testimony and evidence as to whether there had been a slow-down in work around the time of plaintiff's discharge. Plaintiff presented testimony that there had been no slow-down and that the workload had remained *constant*. Plaintiff also offered exhibits documenting the laborer hours on a per month and year-to-date basis. The record reveals, however, that in an attempt to move the trial along, the judge abbreviated the testimony concerning those records and stated that he would later review the exhibits himself. The court ultimately, and in summary fashion, found that "the workload was *increasing* during the *winter*." (emphasis added).

On appeal, defendant claims that this finding is clearly erroneous and unsupported by any evidence. Defendant points to the plaintiff's exhibits which show (with the aid of some mental calculations, for the December figures are, and were at trial, missing) the laborer hours for November, December, and January to be, respectively, 8,498, 5,724, and 7,474. Defendant asserts that these figures indisputably show that the work was not increasing and asked us at oral argument to carefully review the documents. We did. And we found the figures for December, January, and February to be, respectively, 5,724, 7,474, and 9,371. Was there clear error? Plaintiff was discharged on December 3. If one considers the district court's reference to "the winter" to mean December, January, and February (a common meaning of winter), and assumes that the district judge

reviewed the exhibits and made the mental calculations necessary to determine the December figure, then it would seem that the district court's finding is supportable. However, at another point in the opinion, the court found, without amplification, that "a change in the project made four full-time escorts unnecessary," a statement which appears to be incompatible with an increase in the workload and reflects the defendant's position at trial. On this record, we are unable to make a determination as to defendant's claim of error.

### C. *Legal Framework*

■ Setting aside for the moment the Supreme Court's recent decision in *Price Waterhouse v. Hopkins*, — U.S. —, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the analytical framework for a Title VII case is well established. First, the plaintiff must present a *prima facie* case of discrimination. A discharged plaintiff can ordinarily establish the *prima facie* case by showing: (1) she was a member of a protected class; (2) she was satisfactorily performing the duties of her position; (3) she was discharged; and (4) her employer sought a replacement for her. These elements may be adjusted to fit differing factual situations. For example, in a reduction-in-force case, the plaintiff may establish the fourth element by showing that others not in the protected class were treated more favorably. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Oxman v. WLS–TV*, 846 F.2d 448 (7th Cir.1988); *Andre v. Bendix Corp.*, 841 F.2d 172 (7th Cir.1988). Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). If the defendant meets this burden, then the plaintiff must come forward and prove that the defendant's proffered reasons for its employment action were a pretext for discrimination. The plaintiff can meet this burden by directly persuading the court that a discriminatory reason more likely motivated the employer or by showing that the proffered reasons are unworthy of credence. A plaintiff may show that the proffered reasons are not worthy of credence by showing that (1) they have no basis in fact, or (2) they did not actually motivate the employer's decision, or (3) they were insufficient to motivate the discharge. *See Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1364–65 (7th Cir.1988); *Kier v. Commercial Union Insurance Companies*, 808 F.2d 1254, 1259 (7th Cir.1987).

■ The district court's opinion, in narrative form, does not reflect this analytical framework and is absent any citation to authority. While it is true that on review disputes about the *prima facie* case fall away and the only question is whether there was sufficient evidence for the factfinder to conclude that the employer intentionally discriminated, a district court should state the evidence of discrimination and articulate its reasons for rejecting as pretext (or accepting) each of the employer's proffered explanations. Here, the employer offered five justifications for the discharge: failure to respond to radio calls, leaving the premises without permission, late arrivals and early departures, personality conflicts with the other escorts, and poor job performance. The district court briefly addressed two of these. First, the court mentioned in passing that "the defendant's witnesses exaggerated the frequency of her late arrivals and early departures." Second, and most troubling, the court appeared to find that personality conflicts with the other escorts were both a non-pretextual and a pretextual reason for the discharge. The inconsistency cannot be reconciled by this court.

Finally, we note the possible application of *Price Waterhouse*, in which the Supreme Court held that where a trial court finds that an employer was motivated by both legitimate and discriminatory reasons, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the discriminatory motive. At oral argument, both parties indicated that this was a pretext rather than a mixed motive case,

but that in any event each side believes it would prevail under a *Price Waterhouse* analysis. Because the case is so new, and recognizing that the district court did not have the benefit of the teachings of *Price Waterhouse*, we express no opinion as to its application in this case. However, on remand the district court should consider whether the principles of *Price Waterhouse* should apply.

### III.

As this opinion illustrates, the entering of adequate factual findings and appropriate conclusions of law, particularly in the sensitive and difficult area of civil rights litigation, is absolutely essential for meaningful appellate review.

For the reasons stated herein, we remand for further findings and clarification of analysis. We shall retain jurisdiction and, upon receipt of the district court's revised opinion, shall proceed to adjudicate this appeal.

REMANDED.