**Cheryl J. JONES, Plaintiff,**

v.

**JONES BROTHERS CONSTRUCTION COMPANY, Defendant.**

**No. 88 C 979.**

United States District Court, N.D. Illinois, E.D.

Aug. 1, 1989.

John L. Gubbins, John L. Gubbins & Associates, Ltd., Stephan A. Glickman, Chicago, Ill., for plaintiff.

Barbara J. Stuetzer, Katten, Muchin & Zavis, David M. Meister, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

On December 29, 1988, following a bench trial, this court ruled that defendant Jones Construction Company had discriminated against plaintiff Cheryl Jones on the basis of her sex, and that accordingly the defendant had violated the plaintiff's rights under Title VII. The court memorialized its ruling in eight pages of factual and legal findings (referred to herein as "Findings"), and entered judgment in the amount of $27,152.52. On appeal, the Seventh Circuit held that these findings did not adequately support the ruling, and remanded the case to this court for additional findings. 879 F.2d 295. This court here abides that order.

## THE ORIGINAL RULING

In the original ruling, this court determined that the plaintiff was "performing her job [as an escort] satisfactorily" (Findings at 5) when the defendant's supervisor, Mr. John Oxford, decided to fire her. Although Mr. Oxford contended that he did so because the plaintiff repeatedly came to work late, left early, and disobeyed orders to stay on the construction site, this court found those claims to be "exaggerated" (Findings at 5), and found instead that the real reason for his decision was that he had decided to reduce the number of escorts from four to three, and that personality conflicts between the three other escorts (all women) and the plaintiff—arising from the fact that the other escorts resented the plaintiff's close relationship with her superintendent Jerry Rush—caused Mr. Oxford to choose the plaintiff as the one to remove. Findings at 5.

■ This court recognized that, at first blush, this decision did not appear discriminatory: Title VII does not prohibit discrimination on the basis of personality. Findings at 5. Yet, while this proffered reason for discharging the plaintiff sufficed to justify her removal from a position as full-time escort, it did not justify her discharge. For although the defendant's need for full-time escorts had dropped from four to three, Findings at 4, its need for non-escort laborers, skilled and unskilled, had remained the same and even increased slightly around the time Mr. Oxford fired the plaintiff, Findings at 7. When Mr. Oxford began working for the defendant, the plaintiff had been performing a combination of laborer and escort tasks. Findings at 6. The refusal of Mr. Oxford or his boss, Mr. Walter Nealey, even to consider returning the plaintiff to a position as laborer—a position her immediate supervisors found her fully capable of performing—combined with their failure to hire a single female laborer during their entire tenure with the defendant, suggested that the plaintiff's sex had influenced the defendant's decision to discharge her. Findings at 4, 6. This court's additional finding that Mr. Oxford had used derogatory terms in referring to the female escorts on the job site (Findings at 4) confirmed to this court that the plaintiff's sex had played a critical role in her discharge. Findings at 7.

## THE SEVENTH CIRCUIT'S CRITICISM

The Seventh Circuit leveled three general criticisms at this court's ruling: first, that the factual findings were insufficient; second, that the factual findings were inconsistent; and third, that the court's conclusions of law were not structured along the lines of an appropriate legal framework. The court will address, and hopefully alleviate, each criticism seriatim.

*Insufficient Factual Findings*

The Court of Appeals stated that this court had left a number of factual issues unresolved. Frankly, this court believed, and still believes, that each of these factual disputes was either impliedly resolved in, or immaterial to, the court's ruling. In deference to the higher court's order, however, this court will provide its findings on each issue (along with a brief explanation as to why the court did not set them forth explicitly in the original ruling).

1. Did Nealey and Oxford hold a meeting and announce new rules regarding the escorts' responsibilities, and did the plaintiff attended this meeting?

This court finds that Mr. Nealey and Mr. Oxford did hold such a meeting, that the plaintiff attended the meeting, and that at the meeting Mr. Nealey and Mr. Oxford instructed the laborer/escorts that their primary responsibility thereafter was to work as escorts. The court, however, finds that the two supervisors did not specifically instruct the escorts that they could take orders only from them. Further, Mr. Oxford's willingness to allow Mr. Rush and Mr. Kelly to give the plaintiff her daily assignments indicates that no such policy was in force.

(The court found no need to specify this factual finding because the court explicitly found that the plaintiff's failure to obey rules did not form the basis for the decision to fire her. *See* Findings at 5.)

2. Did Nealey hold a meeting with the supervisors to announce the new rules?

The court finds that Mr. Nealey did hold such a meeting, and that at this meeting he instructed the supervisors not to use any one escort exclusively.

(This court did not make a specific finding on this point because it seemed irrelevant to whether the *plaintiff* obeyed her instructions and duties.)

3. Did Nealey inform superintendent Rush of the new rules?

The court finds that Nealey did personally inform Mr. Rush that he should avoid using the plaintiff exclusively and that he should make her available for other superintendents and supervisors.

(The court did not make a specific finding on this point because, again, it appeared

irrelevant to whether the plaintiff was obeying her instructions.)

**4. Did the plaintiff respond to radio calls?**

The court finds that, for the most part, the plaintiff responded to radio calls, but that on a few occasions she was away from her radio performing assignments for Mr. Rush.

(The court did not make a specific finding on this score because the court believed it to be implied both from the explicit finding that Mr. Oxford exaggerated his problems with the plaintiff and from the explicit finding that personality conflicts with the other escorts, rather than the failure to obey rules, resulted in the plaintiff's removal from her full-time escort position. *See* Findings at 5.)

**5. Was the plaintiff frequently tardy and was she repeatedly reprimanded for this tardiness?**

The court finds (as it did in its original ruling) that "the plaintiff *occasionally* came late to work and left early." Findings at 3 (emphasis added). The court further finds that Mr. Oxford reprimanded the plaintiff only once, and that this occurred after he saw her performing some work for Mr. Rush. The court did not find Mr. Oxford's testimony that he reprimanded the plaintiff on numerous occasions credible, for a number of reasons. First, if Mr. Oxford was to be believed, then he allowed the plaintiff to remain on the job for nearly five months while she repeatedly lied to him, violated company rules, and defrauded the company; the court found this difficult to accept. Second, the court found the plaintiff to be a credible witness, and her testimony directly contradicted Mr. Oxford's testimony on this score. Finally, Mr. Oxford was unable to produce a single document supporting his view of the plaintiff's work habits, with the exception of a letter he wrote in anticipation of possible future litigation after he fired the plaintiff.

(The court believed it had made an adequate factual finding on this score. Although Fed.R.Civ.P. 52(a) requires district courts to make findings of fact based on the credibility of the witnesses, this court had never understood that rule as mandating a point-by-point explication of its credibility determinations.)

**6. Were similarly situated males treated more favorably?**

■ The court finds that male workers with equally or more serious working deficiencies were treated more favorably than the plaintiff. The defendant's witnesses admitted that there were times when male workers came late or left early, yet they were merely warned and sent back to work. The plaintiff, by contrast, was fired after only a few such incidents.

(The court did not make a specific finding on this score because it rejected the defendant's position that the plaintiff had serious performance problems, and because the court did not believe that performance deficiencies served as a basis for Mr. Oxford's decision to fire her. *See* Findings at 5.)

**7. Did the escorts perform laborer work before Mr. Nealey and Mr. Oxford arrived, and did the nature of their work change after the two new supervisors took control?**

The evidence was uncontroverted that the plaintiff performed numerous laborer tasks prior to the arrivals of Mr. Nealey and Mr. Oxford. The evidence was less clear on this score with regard to the other escorts, but the fact that Mr. Nealey and Mr. Oxford found it necessary to instruct the escorts that they should concern themselves primarily with escort work indicates that the other escorts also had been performing at least some non-escort functions before the two new supervisors arrived. After their arrival, the evidence indicates that all four escorts performed primarily escort services, but that the plaintiff continued to do some non-escort work when Mr. Rush instructed her to do so.

(The court thought it adequately had made these findings in its original ruling. Findings at 2, 3.)

8. Did the defendant attempt to hire female laborers?

■ The court does not believe the testimony of Mr. Nealey and Mr. Oxford that they were willing to hire female laborers. Their testimony that they repeatedly sought out female laborers was unconvincing, and there was no question that they failed to hire a single woman as a laborer during their tenure with the defendant. Further, by Mr. Nealey's own admission, they did not even consider the plaintiff as a candidate for a laborer position when they terminated her position as escort.

Of course, had this court believed that Mr. Oxford fired the plaintiff because of her work deficiencies, then the fact that he did not hire her as a laborer would not have been significant. The court, however, did not believe that such deficiencies formed the basis for Mr. Oxford's decision, and found it particularly telling that Mr. Oxford decided to fire the plaintiff without even consulting the two immediate supervisors for whom she did most of her work, Mr. Rush and Mr. Kelly. Indeed, neither Mr. Nealey nor Mr. Oxford could get their stories straight as to why they fired the plaintiff: At times they testified that the decision arose out of her work habits; at other times they insisted that the decision resulted from a reduction in the need for escorts. This court believed the latter—a belief supported by the fact that they did not subsequently hire another full-time escort—and concluded that the reason they did not retain her as a laborer (where she could also have filled in as a needed part-time escort) was because they had no interest in having women work as non-escort laborers on their job sites.

(The court thought it had made a sufficient finding that the defendant did not hire female laborers because it did not want women serving as laborers. *See* Findings at 6. The court acknowledges that its statement that it could not believe that no women were available for a $35,000 a year job was not supported by the record.)

*Inconsistent Findings*

■ The Court of Appeals spent an entire subsection of its opinion discussing what it perceived as an inconsistency between, on the one hand, this court's finding that the number of escorts the defendant needed fell from four to three in December and, on the other, the court's finding that the overall workload increased throughout the winter following the plaintiff's firing. Yet, as the Court of Appeals acknowledged (after gratuitously questioning whether this court bothered to do the necessary calculations), the workload of laborers did increase throughout the winter. At the same time, there is no dispute as an empirical matter that the defendant did not hire another full-time escort. Further, the defendant's witnesses repeatedly testified that even when the workload was increasing, the need for specific types of workers—including escorts—could be decreasing.[1] This court found (and still finds) no inconsistency in its findings that the defendant's need for escorts fell while its overall need for laborers grew.

*Absence of Appropriate Legal Framework*

The Seventh Circuit's final criticism of this court's ruling concerned this court's failure to set forth with particularity how

---

1. For example, Mr. Nealey testified on redirect examination as follows:

Q. Do you remember Mr. Gubbins telling you that the hours remained pretty constant over that time? Do you recall that, sir?
A. Yes.
        *     *     *     *     *     *
Q. Tell me with regard to the number of hours, is it—can you tell me, does that mean that everybody is performing the same job throughout that period of time?
A. No.
Q. Can the mix of hours—can the mix of work change?

A. Yes, work changes at the airport very rapidly.
Q. And depending on the mix of work, would that have an impact on the number of escorts that were needed?
A. Yes.
A. And can you have the same number of hours yet have a decreased need for the escorts?
A. I believe so.
Tr. 519–21.

its factual findings fit within the analytical framework for indirect proof of discrimination. *See McDonnell Douglass Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This court did not do so for two reasons. First, the court felt that the direct and circumstantial evidence of discrimination—e.g., Mr. Oxford's demeaning references to the plaintiff as a "broad" who would be fired if she did not keep herself in line—made indirect analysis unnecessary. *See Oxman v. WLS–TV,* 846 F.2d 448, 452 (7th Cir.1988). Second, the court did not believe it necessary to spell out the burden-shifting analysis so long as it set forth all of the factual elements and reached the ultimate conclusion that sex played a critical role in the discharge. Because the Court of Appeals apparently disagrees, however, this court here elaborates on its legal conclusions.

■ In ordinary discharge cases, a plaintiff establishes a *prima facie* case of discrimination by proving (1) that she is a member of a protected class, (2) that she was satisfactorily performing the duties of her position, (3) that she was discharged, and (4) that her employer sought a replacement for her. Further, in reduction-in-force cases, the plaintiff can satisfy the fourth element by establishing that others not in the protected class were treated more favorably. This case, however, involved a hybrid situation. It was not an ordinary discharge case because this court found that the defendant fired the plaintiff in order to reduce the number of escorts. Nor was it a typical reduction-in-force case since the court found no (credible) evidence that the defendant has been laying off workers overall at the time of the plaintiff's discharge.

That the plaintiff could not fit her proof neatly within the traditional framework made her case more difficult, but, in this court's view, did not preclude her from prevailing. The Supreme Court has instructed that, although the "prima facie case method ... is ... a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination," it is not "intended to be rigid, mechanized, or ritualistic." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *accord United States Postal Service Board of·Governors v. Aikens,* 460 U..S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983). This court thus analyzed the situation as follows.

■ The plaintiff is a woman. She was satisfactorily performing her duties. The defendant had other work available for which she was qualified. Yet, she was discharged. Why? The defendant provided five reasons: failure to respond to radio calls; leaving the premises without permission; late arrivals and early departures; poor job performance; and personality conflicts with the other escorts. For all of the reasons discussed above, this court did not believe that the first four factors played a role in Mr. Oxford's decision to fire her, but did agree that her personality conflicts with the other escorts led Mr. Oxford to choose her among the four as the one to remove when the need for escorts dropped, as the defendant's witnesses testified that it did, in early December.

This justification, however, did not tell the whole story. Although the defendant no longer needed four full-time escorts, it did have work for more than three, and had a continuing need for skilled and unskilled non-escort laborers (as evidenced by Mr. Rush's ongoing battle with Mr. Oxford to use the plaintiff in non-escort capacities). Mr. Nealey testified that, had he known the plaintiff could perform this labor, he would have retained her, but that he did not know. Tr. 529. Yet, Mr. Oxford surely did know that the plaintiff could do, and in the past had done, unskilled labor (see Tr. 627) but he did not even consider her for this work. Why not?

Well, had Mr. Oxford's reason for removing the plaintiff from her position as an escort been her poor performance or work habits, then he obviously would not have wanted her merely to switch jobs. That, however, was not his reason for removing her from this position; instead, he removed her because she did not get along with the

other escorts. This justification explains why he terminated her position as full-time escort, but does not explain why he refused to return her to what she was doing before Mr. Nealey and Mr. Oxford arrived—that is, a combination of general labor and escort work. Mr. Rush found the plaintiff's work outstanding, continuously sought her for non-escort services, and urged Mr. Oxford to allow her to remain with the company, but Mr. Oxford refused. Based on Mr. Oxford's attitude toward women at the job site, his failure ever to hire a female laborer, and his non-credible testimony, this court determined that the plaintiff's sex served as the primary factor in his decision not to retain the plaintiff as a laborer.[2] This court originally ruled, and still believes, that such conduct violated the plaintiff's rights under Title VII.

### ADDENDUM

In its original ruling, this court attempted to set forth all of the factual findings necessary to explain its ruling: that the plaintiff is a woman; that she was satisfactorily performing her duties as an escort and, when instructed to do so, as a general laborer; that she was discharged from her position as an escort because of her personality conflicts with the other escorts; that these personality conflicts were insufficient to justify her discharge because she could have been retained as a general laborer; that she would have been retained as a laborer/part-time escort had she been a man; and that she was not so retained. Rather than accepting these factual findings, and exploring the record to determine whether or not they had sufficient evidentiary support, the Court of Appeals chose to reprimand this court for not providing book and verse to explain them. In the course of doing so, the Court of Appeals ignored many of this court's factual findings, misread others so as to find inconsistencies that did not exist, gratuitously ques-

tioned this court's examination of the record, and criticized the court for omitting factual findings that were immaterial to this court's legal conclusion. (For example, how could what Mr. Oxford told Mr. Rush about the new rules have impacted one iota on Mr. Oxford's view of whether the plaintiff was performing her duties as she understood them?)

With the benefit of the trial transcripts prepared for the Court of Appeals, this court has here provided a more comprehensive and complete explanation of the factual and legal issues bearing on the original ruling. This luxury, however, is unusual. The Court of Appeals repeatedly has urged district courts to rule as quickly as possible on bench trials, either immediately upon the conclusion of closing arguments or shortly thereafter, and this court has made an effort to abide that request. The unique fact pattern of this case made it a difficult one to call, particularly without the ability to review in detail all of the testimony. If this court's original ruling lacked specificity in certain particulars, and the Court of Appeals needed further explication to ensure a proper review, this court gladly would have elaborated on its original ruling. Why the Court chose to exaggerate the ruling's deficiencies, and to suggest that this court haphazardly rendered its judgment, this court cannot say. In any event, because this court defers to the order of the superior court, it has endeavored to provide a detailed—if at times redundant—exposition of the aspects of the original ruling which the Court of Appeals could not understand.

### CONCLUSION

Responsive to the Seventh Circuit's July 20, 1989 order, this court hereby enters its additional findings of fact and conclusions

---

**2.** Subsequent to this court's original ruling, the Supreme Court held that when a defendant has based an employment decision on both discriminatory and non-discriminatory motives, the defendant bears the burden of proving that it would have made the same decision even absent the discriminatory motive. *Price Waterhouse v.*

*Hopkins,* —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). That case, however, has no impact on this court's ruling here. Though the defendant had a non-discriminatory reason for removing the plaintiff from her job as an escort, it had no such reason for refusing to retain her as a laborer.

of law, and re-enters judgment for the plaintiff.