Craig **NEAL, Plaintiff,**

v.

**ALDEN PRESS, INC., Defendant.**

**No. 91 C 6316.**

United States District Court,
N.D. Illinois, E.D.

March 10, 1993.

David L. Lee, Law Office of Frederic F. Brace, Jr., Chicago, IL, for plaintiff.

James A. Burstein and Jeri Anne Lindahl, Pope, Ballard, Shepard & Fowle, Ltd., Chicago, IL, for defendant.

### *ORDER*

NORGLE, District Judge.

This matter originally was a three count action in which plaintiff Craig Neal ("Neal") alleged defendant Alden Press, Inc. ("Alden Press") violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Count I alleging discrimination in failure to promote was withdrawn and waived by Neal, and is therefore dismissed with prejudice. Count II alleges termination in retaliation for engaging in protected expression. Count III alleges racially based discrimination in the termination decision.

The court makes the following findings of fact and conclusions of law based upon the evidence and argument at the trial on the merits.

## FINDINGS OF FACT

1. This is an action under Title VII for alleged discrimination and retaliation. (*See* Stipulated Fact No. 1 of the Pre–Trial Order).

2. This court has jurisdiction under Title VII 28 U.S.C. § 1343. (*See* Stipulated Fact No. 2 of the Pre–Trial Order).

3. This cause of action arose in the Northern District of Illinois and venue is proper in this District under 28 U.S.C. § 1392(b). (*See* Stipulated Fact No. 3 of the Pre–Trial Order).

4. Defendant Alden Press is and was, at all times relevant to this lawsuit, a Delaware Corporation duly registered to do business in the State of Illinois and an "employer" within the definition of Title VII. (*See* Stipulated Fact No. 4 of the Pre–Trial Order).

5. Plaintiff Neal was at all relevant times an "employee" within the definition of Title VII. (*See* Stipulated Fact No. 5 of the Pre–Trial Order).

6. Neal is an African–American citizen of the United States.

7. Neal was a general full-time hourly unskilled worker employed by Alden Press from August 13, 1982 until September 5, 1986, when he was discharged. (*See* Stipulated Fact No. 22 of the Pre–Trial Order).

8. Ronald Pease ("Pease") is a caucasian who worked as the personnel manager for Alden Press from May 1983 through May 1989. After May 1989 he was no longer employed by Alden Press. (*See* Stipulated Fact No. 8 of the Pre–Trial Order).

9. As a general worker, Neal's duties included the cleaning of press areas. White workers and black workers routinely did this work. Neal was regarded as a good worker.

10. In 1985 more than ten employees applied for an apprenticeship position, including Neal.

11. In May, 1985, Neal was one of six final candidates for the 1985 apprenticeship position.

12. Two of the six final candidates for the 1985 apprenticeship position were African–American.

13. Neal did not receive the 1985 apprenticeship position. A well-qualified white man did. Of the six finalists, Wendell Bey, an African–American, ranked highest on the objective factors and had the second most seniority; Neal was tied for second on the objective factors; and Chris Dzwdnowski ("Dzwdnowski"), a white person, was tied for last on the objective score and tied for last in seniority. Tied for last on the objective score and in seniority, Dzwdnowski was ranked first "in order of preference" out of the six finalists. (Pltf.'s Ex. No. 2). According to personnel officer Pease, this ranking was made on the basis of interviews that the six finalists had with two higher echelon white persons, who reported to Pease that their choice was "Chris." Based on these facts, Pease's testimony was that Dzwdnowski was "head and shoulders" above the other finalists.

14. Dzwdnowski received the 1985 apprenticeship position in September of 1985. (*See* Stipulated Fact No. 24 of the Pre–Trial Order).

15. Neal was one of five final candidates for an apprenticeship position in May of 1986.

16. Two of the five final candidates for the 1986 apprenticeship position were African–American.

17. Neal did not receive the 1986 apprenticeship position.

18. Mark Somrek ("Somrek"), a caucasian, received the 1986 apprenticeship position. (*See* Stipulated Fact No. 26 of the Pre–Trial Order). The reasons Pease gave in 1986 for promoting Somrek over Neal were that the promotion would result in "the least amount of dissention from the rank and file," that Somrek was the most senior under the contract with the union, and that Somrek had shown outside interest in the trade. (Pltf.'s Ex. No. 5). The outside interest included the taking of graphic arts courses. No other applicant took such courses. Pease testified

that he was "just trying to follow the collective bargaining agreement." When Dzwdnowski was promoted he was not the highest in seniority.

19. Before his discharge on September 5, 1986, Neal never complained that race was a factor in his not receiving the apprenticeship position in 1985.

20. Before his discharge on September 5, 1986, Neal never complained that race was a factor in his not receiving the apprenticeship position in 1986.

21. On numerous occasions Neal used the expression, "Suck my big black dick." Neal had referred to a white man who was recently hired as "the great white hope." The man hired was muscular, heavy, and tall. In August, 1986, Al Michalek ("Michalek"), one of Alden Press's foremen, said to Neal, "Why don't you go over to him and tell *him* to suck your big black dick?" Michalek referred to the large white man. Alden Press regarded the statement of Michalek as a racial slur and sanctioned him by letter after learning of it. Michalek was not involved in the decision to terminate Neal. There is no evidence that the decision makers ever made racial comments.

22. Based on his investigation, Pease concluded that Michalek's comment was made in jest and was precipitated by the racial comment made by Neal. Further, Michalek's comment related to the same comments made by Neal.

23. Alden Press did not learn about Michalek's racial slur to Neal until it received Neal's charge of discrimination filed October 31, 1986, which was after Neal's discharge on September 5, 1986.

24. In a letter October 31, 1986, Michalek was disciplined for making the racial slur to Neal.

25. Neal requested to work the Labor Day weekend from Saturday, August 30, through Monday, September 1, 1986. Alden Press granted the request. Neal did not work those days. (*See* Stipulated Fact No. 36 of the Pre–Trial Order).

26. On August 28, 1986, Neal was assigned to work as a general worker on Alden Press's second shift, from 3:00 p.m. through 11:00 p.m.

27. Neal was assigned to press No. 16 during the second shift. Also working on that press was first pressman Larry Schneider ("Schneider") and second pressman Joseph Fallico ("Fallico").

28. On August 28, 1986, Fred Thorelius ("Thorelius") was the second shift manager. (*See* Stipulated Fact No. 27 of the Pre–Trial Order).

29. On August 28, 1986, second pressman Fallico had the authority to instruct Neal in his employment duties.

30. On August 28, 1986, Neal refused to perform his work duties as instructed by first pressman Schneider and Neal's immediate supervisor, Fallico. Neal was directed to change the cardboard under the machine, not to mop up, and not to make a project out of it. Neal began flinging a mop bucket around, and insisted he would do it by mopping up. Cleaning up around and under the machines was routinely done by the general workers two or three times a month.

31. On August 28, 1986, Neal left his work station without permission. All workers were routinely required to obtain permission.

32. Neal refused to return to his work station as instructed by his Schneider and Fallico.

33. After refusing to return to his work station, Neal told Fallico that he wasn't "nobody's fucking nigger." The statement of Neal implicitly accused Fallico and Schneider of racially-based improper conduct.

34. After refusing to return to his work station, Neal told his shift manager, Thorelius, that he had to leave "before he hurt or killed someone." In response, Thorelius told Neal to go home.

35. Neal left work before the end of the shift on the night of August 28, 1986.

36. On August 28, 1986, Neal did not request or receive permission to leave work early. The court does not believe the self-serving assertion of Neal that he requested and received permission to go home. The court finds the testimony of Thorelius credi-

ble on this point. Neal testified that he asked Thorelius for permission to leave work early and received that permission. Thorelius testified that Neal came up to him talking crazy and ranting and raving and that he told Neal to "go home." The factfinder infers from the words "go home" under the totality of circumstances that Thorelius was not granting a request for permission to go home. Thorelius was ordering Neal to go home in light of Neal's statement to hurt or harm. The court finds Thorelius's account of what occurred credible and gives greater weight to his testimony.

37. Neal called Alden Press on August 29, 1986, and said he would be sick until September 2, 1986. (*See* Stipulated Fact No. 28 of the Pre–Trial Order). He gave no details of his health problem.

38. On September 2, 1986, Neal called Alden Press and said he had back problems. (*See* Stipulated Fact No. 30 and the Pre–Trial Order).

39. Neal also said he wanted to speak with Company President, Jerome Spier ("Spier"). Neal did not speak with Spier on that date. (*See* Stipulated Fact No. 29 of the Pre–Trial Order).

40. Pease concluded that Neal's four-day absence from August 29 through September 1, 1986 was unexcused.

41. Between August 29 and September 3, 1986, Pease investigated Neal's behavior on the night of August 28, 1986 by speaking with Neal's co-workers including Schneider, Fallico, and Thorelius. (*See* Jt. Exs. Nos. 4 and 5).

42. During that investigation, Pease was told that Schneider was "very upset as a result of being called a bigot by Craig Neal." (*See* Jt. Ex. No. 4). Pease wrote two memos to file concerning August 28. He said he did this because he was terminating Neal and he wanted to document the termination because termination was unusual.

The first memo to file was written September 2, 1986. (Jt. Ex. 4). In that memo, Pease wrote:

Larry Schneider [the first pressman] was very upset as a result of being called a bigot by Craig Neal.

The second memo to file was written September 3, 1986. (Jt. Ex. 5). In that memo, Pease wrote:

[Schneider] is still upset about Craig accusing him of being prejudice [sic] toward blacks.

43. On September 3, 1986, Pease called Neal at home and asked him to come in for a meeting on September 5, 1986. (*See* Stipulated Fact No. 31 of the Pre–Trial Order).

44. Before the September 5th meeting and after his investigation, Pease conferred with Spier and company vice president Chuck Wilson ("Wilson") regarding Neal's behavior on August 28, 1986.

45. Prior to Neal's meeting on September 5, 1986, Pease, Spier, and Wilson concluded that Neal was insubordinate, disruptive, and left work early without a legitimate reason on August 28, 1986. Based on these reasons, they decided to fire Neal.

46. The purpose of the September 5, 1986 meeting between Neal, Pease, and Wilson was to obtain Neal's version of what occurred on August 28, 1986 to see if there was any justification for reversing the decision to terminate Neal.

47. Pease, Wilson, and Neal attended the meeting on September 5, 1986 at Alden Press. (*See* Stipulated Fact No. 32 of the Pre–Trial Order).

48. At that meeting, Neal told Pease and Wilson that he had a "bad Attitude" against Alden Press, that his bad attitude was the result of a "bunch of things," that his bad attitude was the cause of his behavior the night of August 28, 1986, and that his bad attitude would not change. (*See* Jt. Ex. No. 6). According to Pease, he and Wilson had already decided to fire Neal before the meeting. Pease wrote a memo to file that he termed "[m]inutes of [the September 5th] meeting." (Jt. Ex. No. 6). These minutes accord with Neal's testimony concerning this meeting.

According to the minutes, the meeting did not open with Neal being told that he was going to be fired, but rather opened with:

Chuck Wilson stating that he understood that a problem had developed on Thursday night, and it was serious enough that he should look into it.... The purpose of this meeting was to hear Craig's side of the story *and determine what should be done about the Thursday incident.*

(Jt. Ex. No. 6, emphasis added).

According to the minutes of the meeting, Pease and Wilson told Neal that they were "upset about the racial overtones [Neal] had inferred the night of the incident" and went on to say that they had "found no evidence of such" and that "no such behavior would be tolerated either in actuality or accusation." (Jt. Ex. 6, emphasis added).

Neal responded to this by asking why Alden Press "didn't ... have any black salesmen, foremen, managers or prep employees...." (Jt. Ex. No. 6). Neal also stated that he was "frustrated about the limited promotional opportunities available" at Alden Press. (*See* Jt. Ex. No. 6). At this time, Alden Press's EEO–1 reports revealed that out of approximately 180 to 190 officials, managers, professionals, technicians, sales workers, and office and clerical workers, only about six to eight were black. (Jt. Ex. 3, Pltf. Ex. 1). In total, Alden Press employed fifty black and forty-one hispanic males. After Neal asked why Alden Press lacked black salesmen, foremen, managers, or prep employees, Wilson told him "You're a good worker, but sometimes you have to keep your mouth shut to keep your head from being cut off."

Wilson then told Neal that he "would give him whatever recommendations he needed for the new employer." (Jt. Ex. No. 6). Neal was terminated at the end of the meeting. According to Pease, the reason he gave Neal at the time for the firing was "bad attitude during the past several months, derogatory comments towards co-workers, and missing four days of work without regard to the company." (Jt. Ex. No. 6). In an "employee Separation Form" prepared for Alden Press's unemployment compensation administrator, the reason given for Neal's firing was "Other" with the remarks:

Poor attitude. Absent from work without legitimate reason. Left work on 9:30 p.m.

on 8/26/96 because employee says 'he was tired of everyone dumping on him.' Called in sick through 9/2/86.

49. Neal never provided a doctor's excuse for his absence starting on August 29, 1986.

50. In 1986 and in 1987 Alden Press employed black foremen, managers, and prep employees. (*See* Jt. Ex. No. 2 and Pltf.'s Ex. No. 1).

51. At the September 5, 1986 meeting it was explained to Neal that the 1986 apprenticeship position was "determined by seniority since the remaining candidates were equal in all other areas," and that Alden Press hired based on "experience only." (*See* Jt. Ex. No. 6). The union agreement provided for seniority in promotions.

52. Neal was advised that he was discharged at the September 5, 1986 meeting. (*See* Jt. Ex. No. 6).

53. Neal was discharged for his insubordinate, disruptive behavior and leaving work without a legitimate reason the night of August 28, 1986, his unexcused absence starting on August 29, 1986, and his self-described "bad attitude" that he claimed would not change.

54. Neal was fired in part for conduct substantially similar to conduct for which non-black employees, Henry Doodakin, Kenneth Erb, and John Gianfrancesco were fired. (*See* Def.'s Exs. Nos. 7 through 17).

55. Former Alden Press general workers, Nate King, African–American, and David Mueller, caucasian, both had excessive absenteeism records when employed by Alden Press and neither were terminated by personnel manager Ronald Pease during his tenure with Alden Press. Both Nate King and David Mueller were eventually terminated for excessive absenteeism. (*See* Def.'s Exs. Nos. 18 through 20 and Nos. 22 through 24).

56. Neal was not fired for excessive absenteeism.

57. Neal did not file a grievance with his union protesting his firing or any alleged discriminatory treatment by Alden Press. (*See* Stipulated Fact No. 42 of the Pre–Trial Order).

58. Neal did not graduate from high school. (*See* Stipulated Fact No. 40 of the Pre-trial Order).

59. Neal claimed he graduated from high school on his Alden Press employment application. This fact was not a factor in the decision to terminate.

60. On his R.R. Donnelly & Sons Company employment application dated July 22, 1991, Neal claimed he graduated from high school and that the reason he left Alden Press in 1989 was because of "layoff." (*See* Jt. Ex. No. 9)

61. Neal smoked tobacco cigarettes in October of 1990.

62. On his Field Container employment application dated October 16, 1990, Neal claimed he graduated from high school, that he left Alden Press because of "layoff," and claimed he did not use or smoke tobacco products. (*See* Jt. Ex. No. 10).

63. On his NewsWeb employment application dated April 20, 1992, Neal claimed he graduated from high school, that he left Alden Press because of a "new job," and claimed that he had never been fired from employment. (*See* Jt. Ex. No. 11).

64. On October 21, 1986, Neal filed with the Illinois Department of Human Rights a charge of discrimination (IDHR Charge No. 1987 CF 1131), which is attached to his complaint.

65. In his charge of discrimination filed on October 21, 1986, Neal states in Section III.H. that during his termination meeting on September 5, 1986, he "mentioned the incident with Makelowickz [Michalek] and told them [Pease and Wilson] that Respondent is practicing racial discrimination in its policy and practice of not promoting blacks." No other complaints of race discrimination allegedly made to Alden Press are mentioned in Neal's charge of discrimination. (*See* charge of discrimination attached to Neal's complaint).

### CONCLUSIONS OF LAW

*Count I of Neal's Complaint*

Neal has waived any right to relief under this Count and therefore it is dismissed with prejudice. (*See* "Waiver of Claims or Defenses" in the Pre–Trial Order).

*Count II of Neal's Complaint*

■ 1. Neal's accusation that Schneider is a bigot, made before Neal's discharge on September 5, 1986, is not protected speech under Title VII.

■ 2. Neal's statement to Fallico that he was "nobody's fucking nigger," made on August 28, 1986, is not protected speech under Title VII.

3. Neal did not engage in protected speech *prior* to his termination meeting on September 5, 1986.

4. Neal's accusation that Schneider is a bigot is not causally related to Neal's discharge.

■ 5. Because the decision to terminate Neal was made *prior to* his termination meeting, Neal failed to establish that his alleged expressions to Alden Press and its employees made during the termination meeting are causally related to Neal's discharge. *Maldonado v. Metra,* 743 F.Supp. 563 (N.D.Ill.1990).

6. Neal did not produce sufficient evidence to establish a *prima facie* case of retaliation under Title VII. *Jennings v. Tinley Park Community,* 796 F.2d 962, 966 (7th Cir.1986).

7. Alden Press's reasons for discharging Neal are legitimate and non-discriminatory.

8. Alden Press's business reasons for discharging Neal are not pretextual.

9. Alden Press did not retaliate against Neal when it discharged him.

*Count III of Neal's Complaint*

10. Neal did not produce sufficient evidence to establish that he was performing well enough to meet Alden Press's objectives.

■ 11. Alden Press's discharge of Neal was *not* discriminatory because Neal was discharged for his insubordination, disruptive behavior, and leaving work without a legitimate reason the night of August 28, 1986; for his unexcused absence starting on August 29, 1986; and for his self described "bad

attitude" that he claimed would not change. *Thrailkill v. Aero Drapery Corp.*, No. 90 C 1390, 1991 WL 111208 (N.D.Ill. June 13, 1991) (LEXIS, Genfed Library, Dist. File) (citing *Palucki v. Sears, Roebuck and Co.*, 879 F.2d 1568, 1571 (7th Cir.1989)).

12. Neal did not produce sufficient evidence to establish a *prima facie* case of discharge based on race under Title VII pursuant to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its progeny.

13. Neal's "comparative" evidence does not prove that Neal was treated disparately because of his race. Neal has not established that any other non-black Alden Press employee was similarly situated to him and treated differently.

14. Alden Press's reasons for discharging Neal are legitimate and non-discriminatory.

15. Alden Press's business reasons for discharging Neal are not pretextual.

16. Alden Press did not racially discriminate against Neal when it discharged him.

 The court has followed the burden-shifting formula for determining discrimination claims under Title VII. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Under this formula, a plaintiff bears the initial burden of establishing by a preponderance of the evidence a *prima facie* case of discrimination by showing: (1) he or she was a member of a protected class; (2) he or she was satisfactorily performing the duties of her position; (3) he or she was discharged; and (4) others not in the protected class were treated more favorably. *Jones v. Jones Bros. Constr. Corp.*, 879 F.2d 295, 299 (7th Cir.1989). Once a plaintiff meets that burden, the burden shifts to the defendant "to articulate a legitimate, non-discriminatory reason for its action." *Id.* If the defendant meets this burden, the presumption of discrimination is dissolved, and the burden shifts back to the plaintiff to prove the defendant's actions were a pretext for discrimination "by showing either that a discriminatory reason more likely than not motivated the employer or that the employer's

proffered explanation is incredible." *Oxman v. WLS–TV*, 846 F.2d 448, 453 (7th Cir.1988). The plaintiff may show the defendant's proffered reasons are incredible by showing that "(1) they have no basis in fact, or (2) they did not actually motivate the employer's decision, or (3) they were insufficient to motivate the discharge." *Jones*, 879 F.2d at 299. Although this analysis outlines a shifting burden of production on the parties, the ultimate burden rests with the employee to prove that the employer intentionally discriminated against the employee. *Williams v. Williams Electronics, Inc.*, 856 F.2d 920, 922 (7th Cir. 1988).

### CONCLUSION

Count I is dismissed with prejudice. The court finds for Alden Press and against Neal on Count II and Count III, and enters judgment pursuant to Rule 58.

IT IS SO ORDERED.