Martha **PHAUP**, Dorothy **Moore, Shirley Fitzpatrick** and **Carol Maleske, Plaintiffs,**

v.

**PEPSI–COLA GENERAL BOTTLERS, INC., Defendant.**

**No. 89 C 6893.**

United States District Court, N.D. Illinois, E.D.

April 5, 1991.

Bradley Wartman, Peter Andjelkovich & Assoc., Chicago, Ill., for plaintiffs.

S. Richard Pincus, Jeffrey Beeson, Fox & Grove, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Martha Phaup ("Phaup"), Dorothy Moore ("Moore"), Shirley Fitzpatrick ("Fitzpatrick") and Carol Maleske ("Maleske") have sued their former employer[1] Pepsi-Cola General Bottlers, Inc. ("Pepsi"), alleging discrimination on the basis of sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII," 42 U.S.C. §§ 2000e to 2000e–17[2]). To demonstrate that claimed discrimination, plaintiffs point to events and circumstances surrounding their repeated layoffs beginning in approximately 1987 and culminating in a permanent layoff in June 1989.[3]

Both sides have now moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Pepsi's motion is granted to a minor extent and denied in principal part, while plaintiffs' motion is denied in its entirety.[4]

### Facts[5]

Plaintiffs were hired by Pepsi as bottle inspectors at its 650 West 51st Street, Chi-

---

**1.** Except as to Moore, who continued to be employed by Pepsi when this case was filed.

**2.** All citations to Title VII will take the form "Section—," employing the statutory numbering in Title 42 and not Title VII's internal numbering.

**3.** Moore was reinstated later that same month.

**4.** See Appendix.

**5.** Where cross-motions for summary judgment are involved (here in the form of two separately briefed motions), this Court is in the Janus-like position of having to draw all reasonable inferences in favor of each nonmovant—plaintiffs on Pepsi's motion and Pepsi on plaintiffs' motion (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987)). That has not

cago, Illinois facility (the "51st Street facility"). Each worked in that capacity for many years.[6]

For the most part, Pepsi's 51st Street facility comprised two departments: the Production Department and the Maintenance Department. When plaintiffs were employed at Pepsi, three separate lines made up the Production Department: the returnable bottle line ("Line 3"), the nonreturnable bottle line ("Line 2") and the can line. Plaintiffs' jobs as bottle inspectors were part of Line 3. In addition, the types of jobs within a department were divided into job classifications that determined wages. For instance, plaintiffs' jobs placed them in the machine crew classification, immediately above the general plant classification that involved various duties in the warehouse.[7] Out of the 22 people in the machine crew classification, Phaup was the fifth most senior, Moore the sixth, Maleske the seventh and Fitzpatrick the eleventh (D.Mem.Ex. M).

There were at least three ways in which a Pepsi employee might change jobs within the 51st Street facility. Because those different possibilities are relevant to plaintiffs' claims, they will be outlined briefly.

First, an employee could obtain a permanent job change to a higher job classification according to the procedure set out in the collective bargaining agreement (the "Agreement"[8]) between Pepsi and Teamsters Local Union No. 744 ("Union," D.Mem.Ex. G).[9] Section 16.2 provides in relevant part:

Permanent job vacancies in the job classifications covered by this Agreement in the Production Department or the Maintenance Department shall be posted for a period of three (3) working days during which time employees in lower rated job classifications in the department where the vacancy occurs shall be eligible to bid thereon. Such posting shall contain the job classification, the wage rate for the position, and the usual starting time. Eligible employees desiring to bid on such jobs shall sign their names in the space provided on the bulletin board posting sheet. Where the ability to perform the job which includes physical fitness is relatively equal among the employees bidding for the job, preference in filling the position will be given to the qualified bidder on the basis of his departmental seniority. The Employer will not exercise its discretion as to the relative ability of the employees bidding in an arbitrary and capricious manner and any complaint that the Employer has exercised its discretion in an arbitrary and capricious manner shall be subject to the Grievance and Arbitration Procedure.

Only Fitzpatrick sought a permanent job change through the formal bidding procedure. She signed her name to a posting on three separate occasions. Initially in June 1987 she bid on the Can Line Filler Operator position. It was awarded to a man with less seniority than Fitzpatrick. Next she bid on the Machine Operator Can Line position in August 1988. She was awarded an opportunity to qualify and then trained for two weeks. At that point William Heenan ("Heenan"), the immediate supervisor for that position, and Production Manager Phil Weigand ("Weigand") determined that she could not handle the duties of the position

---

been an easy task in this case, where the parties disagree both within their own ranks and with each other as to what exactly occurred and as to which events are significant.

6. Phaup had been working at Pepsi the longest, since 1963 (although she first worked in 1949 for 2½ years); Maleske and Moore, since 1964; and Fitzpatrick, since 1968.

7. Machine crew classification jobs were of varying types, generally described in Section 7.1 of the collective bargaining agreement referred to in the next paragraph of the text. General plant job duties included pallet make-up (more on that later), bottle sorting, re-packing, garbage pick-up, pallet sorting, shell sorting, scrubber operation and production line duties (D.Mem.Ex. L, Attachment 5).

8. All further references to the Agreement will simply take the form "Section—." That usage should create no confusion with the use of the same terminology for Title VII citations, given the fact that all of the latter begin with "2000e."

9. Throughout their employment at Pepsi, plaintiffs were part of the production and warehouse bargaining unit represented by Union.

and therefore did not qualify. That position was awarded to a man with less seniority than Fitzpatrick. Finally in June 1989 Fitzpatrick bid for a forklift operator job in the warehouse. She had the most seniority of the 15 employees who bid—all the rest were male. Five men were chosen for the job.

As a second type of job change, an employee could hold a different position on an interim basis by filling in temporary job openings (due to vacations, illness or other absenteeism). Such openings were not covered by the Agreement and were filled according to a procedure formulated by management.[10]

Finally, employees could find work in a different position during a layoff. That type of transfer followed the procedures set out in Section 16.3:

> In the event of a decrease in the working force, employees with the least seniority in the job classifications to be reduced shall be removed from the classification. An employee thus displaced shall be assigned to displace the least senior employee in a lower paid job classification within his department who has less departmental seniority than he, provided that he is able to perform the work as demonstrated by previous experience and physical fitness.
>
> Where it is determined that the most senior employee seeking a particular job lacks the ability to perform, he will be advised, in detail, as to the basis for such determination and any dispute regarding the ability of an employee to perform a job shall be subject to the Grievance Procedure of this Agreement.
>
> No new employee shall be hired as long as seniority employees are on layoff status. Laid-off employees shall be recalled to their regular job classification in the reverse order of their layoff. Any employee who is laid off due to a reduction in the work force shall receive one (1)

week's notice or one (1) week's pay in lieu thereof.

Beginning in 1987 layoffs at the 51st Street facility became a frequent occurrence for Plaintiffs. Between May 1987 and the June 1989 permanent layoff Phaup was laid off approximately 17 times (Phaup Aff. ¶ 3, P.Mem.Ex. E), while each of Moore, Fitzpatrick and Maleske was laid off about 14 times (Moore Aff. ¶ 8, P.Mem.Ex. F; D's Response to P's First Request to Admit ¶ 51, P.Mem.Ex. H; Maleske Aff. ¶ 2, P.Mem.Ex. G). While plaintiffs were laid off on those occasions, less senior men in the machine crew classification were working (Barry Aff., Attachment 2, D.Mem.Ex. Y; P.Mem.Ex. "A" (attached to that memorandum itself)[11]).

In May 1987 Administrative Assistant Carolyn Barry ("Barry"), whose supervisors were Operations Manager Pat Harris ("Harris") as well as Weigand, prepared and gave Phaup and Fitzpatrick a letter to sign stating that they did not wish to be considered for Line 2 (D.Mem.Ex. T). They both signed the letter and were laid off. Fitzpatrick later recanted. No male employee was ever tendered such a statement.

On May 1, 1988 this provision was added to Section 16.3:

> Employees in the Production Department may volunteer to qualify for pallet building within 2 months after May 1, 1988 and in January annually. When a layoff occurs only those employees previously qualified may secure pallet building positions.

Qualification tests were conducted in mid–1988 and mid–1989 and involved stacking cans or bottles five layers high. Plaintiffs never signed up to qualify.

On January 6, 1989 Weigand met with Phaup, Moore and Maleske to discuss various job opportunities due to their impending layoff (Fitzpatrick had already been laid off). Phaup and Moore requested that they be allowed to do bottle sorting. As

---

**10.** Temporary job openings will be discussed in more detail later in this opinion.

**11.** Although the information in P.Mem.Ex. "A" is not directly supported in the manner prescribed by Rule 56(c), plaintiffs' counsel says it

was drawn from Pepsi's answers to interrogatories (P.Mem. 16 n. 9). In any case, there is no dispute between the parties as to the statement in the text.

one result of that meeting, on that same day Weigand tendered this statement for Phaup and Moore to sign (D.Mem.Ex. N):

> Please be advised that the classification that you have requested to bump down to is a "General Plant" Classification.

> This position would require that you would be able to handle cases, move pallets, be able to pallet build-fulls or empties as well as bottle sort. If a reasonable amount of work is not accomplished, you will be disqualified from this position and will be sent home. This will void your 40 hours work guarantee.

That final reference is to Section 6.1, which provides that except in certain situations an employee is guaranteed payment for a 40–hour week as long as the employee reports for work during that week and is available and willing to work each day. Phaup and Moore were laid off after that meeting. They later filed a grievance charging that the letter discriminated against them because they were female and demanding pay for the week they were laid off (Moore Aff.Exs. 4 and 5, P.Mem.Ex. F). They lost the grievance.

On June 9, 1989 plaintiffs were laid off when their jobs as bottle inspectors were eliminated because Line 3 was moved to a different facility. Moore obtained a position—without a reduction in pay—on Line 2 at the 51st Street facility as of June 19, 1989, and she has continued to hold that position. Maleske trained on that same position in October 1989. She then sent the supervisor a letter stating that the job was too physically demanding and that she would not return to that position (D.Mem.Ex. S). Fitzpatrick was offered the opportunity to train on the same line but refused. Phaup, Maleske and Fitzpatrick did not work after the June 9 layoff and were terminated effective Christmas Eve 1989.

Each plaintiff filed a separate sex-discrimination claim in 1989 with the Equal Employment Opportunity Commission ("EEOC"), and each obtained a Notice of Right to Sue on August 10, 1989 (Complaint Ex. A). This action was filed within the requisite 90 day period.[12]

### Continuing Violation

At the outset this opinion addresses Pepsi's contention that plaintiffs may not obtain relief for any events occurring more than 300 days before their EEOC filing. Though the question can be posed in that single sentence, the answer requires a good bit of analysis.

In Illinois a claimant has 300 days after a discriminatory act within which to file a charge with EEOC (*Stark v. Dynascan Corp.*, 902 F.2d 549, 551 (7th Cir.1990) (citing 29 U.S.C. § 626(d)(2))). Phaup, Fitzpatrick and Moore filed their EEOC charges on January 12, 1989, and Maleske did so on July 11, 1989. Pepsi contends that any claims that Phaup, Fitzpatrick and Moore had before March 19, 1988 and that Maleske had before September 14, 1988 are time-barred.

■ For plaintiffs to predicate recovery on events occurring before the 300–day watershed, they must successfully assert either a theory of "equitable tolling" or of "continuing violation."[13] Though they cannot invoke the former, they qualify in terms of the latter.

■ Under the equitable tolling doctrine, the time limitation period is tolled until (*Vaught v. R.R. Donnelley & Sons Co.*, 745 F.2d 407, 410–11 (7th Cir.1984) (citation omitted)):

> facts that would support a charge of discrimination ... were apparent or should have been apparent to a person with a reasonably prudent regard for his rights similarly situated to the plaintiff.

---

**12.** Although Plaintiffs' Complaint originally contained two counts, Count II (which allegedly retaliation for the filing of an OSHA complaint) has been previously dismissed. Only Count I, the Title VII claim, remains.

**13.** Of course earlier events—even those that are clearly time-barred—may be admissible as *evidence* to support unbarred charges, so long as the earlier events meet the standards of Fed.R. Evid. 404(b).

Here plaintiffs do not argue lack of knowledge of their claims. That is unsurprising, for the evidence tends to show that plaintiffs were aware of possible violations as they occurred.

■ Alternatively, among the various continuing violation theories set out in *Stewart v. CPC International, Inc.*, 679 F.2d 117, 121 (7th Cir.1982) (per curiam), this case falls into the category of cases where (citations omitted):

> the plaintiff charges that the employer has, for a period of time, followed a practice of discrimination, but has done so covertly, rather than by way of an open notorious policy.... In such cases the challenged practice is evidenced only by a series of discrete, allegedly discriminatory, acts.

In such a situation (*id.* (citations omitted, emphasis in original)):

> [A]n employer may be held liable for a continuing practice of discrimination *if* the plaintiff can demonstrate that the practice has actually continued into the "present"—that is, into the time period relevant to the date the charge of discrimination was filed. At least one discriminatory act must have occurred within the charge-filing period. Discriminatory acts that occurred prior to this period constitute relevant evidence of a continuing practice, and may help to demonstrate the employer's discriminatory intent; and they will of course be used to determine the extent of the remedy that is in order. But the prior discriminatory acts do not come into play at all unless the plaintiff can show in the first place that the discrimination is "presently" continuing.

Lack of a *present* discriminatory act is ordinarily the downfall of a plaintiff's claim of a continuing violation (see, e.g., *Lorance v. AT & T Technologies, Inc.*, 827 F.2d 163, 166–67 (7th Cir.1987); *Belda v. Morse-Diesel, Inc.*, 1990 WL 146695, at 3, 1990 U.S. Dist. LEXIS 13029, at 7–8 (N.D.Ill.)). That is surely not the case here, where a number

of layoffs (although not all) occurred within the 300–day period. Thus the main concern of courts—that a plaintiff should not be permitted to bring in an old cause of action by way of the continuing violation concept—is absent here, where plaintiffs have substantial timely claims even without the benefit of the concept.

But the question remains whether events in this case occurring outside the 300–day period can be said to be part of a violation that *continued* into the present. *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir.1989) (citation omitted) addressed that question directly:

> But what exactly does it mean to say that a violation "began" before the statutory period? Here as in most cases there are discrete violations—separate failures to promote. What justifies treating a series of separate violations as a single continuing violation? Only that it would have been unreasonable to require the plaintiff to sue separately on each one. In a setting of alleged discrimination, ordinarily this will be because the plaintiff had no reason to believe he was a victim of discrimination until a series of adverse actions established a visible pattern of discriminatory mistreatment.

Just so, in this case a series of layoffs began in about May 1987 [14] for plaintiffs and continued through the final layoff in June 1989. Would it have made sense for plaintiffs to file EEOC charges each time they were laid off? Unlike failures to promote, layoffs can be (and are most frequently hoped and expected to be) temporary conditions and may initially appear to their recipients to be legitimate, depersonalized business decisions. It appears both likely and reasonable that plaintiffs really began to smell the coffee only after several layoffs and filed their claims shortly thereafter. That likelihood is buttressed by the sequence of events: Plaintiffs did not wait until the June 1989 layoff to file their claims—they did so in the middle of the period of layoffs.[15]

---

**14.** Fitzpatrick was also laid off once in June 1986.

**15.** It is true that Fitzpatrick filed a labor grievance after her June 1986 layoff (charging it violated her seniority rights) and another after a

Additionally, "a policy is by nature continuing" (*Boyd v. Madison County Mutual Insurance Co.*, 653 F.2d 1173, 1177 (7th Cir.1981) (per curiam), quoting 1976 EEOC Compl.Manual ¶ 4102, § 208.1). In that respect see, e.g., *Bartmess v. Drewrys U.S.A., Inc.*, 444 F.2d 1186, 1188–89 (7th Cir.1971) (employer's maintenance of allegedly discriminatory retirement plan held to be a continuing violation). In part plaintiffs are attempting to show that Pepsi discriminated against them in its application of the reduction-in-force policy. Therefore the series of layoffs may be seen less as discrete and unrelated acts and more as a continuing policy that resulted in plaintiffs being laid off on the basis of their sex.[16]

Both in those terms and because plaintiffs are not arguing a continuing violation theory in order to import a stale claim as their main cause of action, this Court finds that the series of layoffs constituted a pattern, bringing into play the teaching of *Young v. Will County Department of Public Aid*, 882 F.2d 290, 292 (7th Cir. 1989):

To succeed under the continuing violation theory, plaintiff must demonstrate that the acts of alleged discrimination are part of an ongoing pattern of discrimination and that at least one of the alleged discrete acts of discrimination occurred within the relevant limitations period.

Consequently plaintiffs are entitled to seek relief for their layoffs and connected events beginning in May 1987.

### Title VII

Section 2000e–2(a) makes it unlawful for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's ... sex ...; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex....

It is generally said that there are two ways for a plaintiff to prove[17] that her employer has violated Title VII—the direct and indirect routes. This opinion will address each method in turn.

### 1. *Price Waterhouse Direct Method*

■ One alternative is for plaintiffs to offer direct proof that Pepsi impermissibly took sex into account in making its layoff decisions. Such proof then triggers the result announced in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989):

We hold that when a plaintiff in a Title VII case proves that her gender played a

---

1987 layoff (making the same charge and ascribing it to sex discrimination). But the former did not ascribe the layoff to Fitzpatrick's sex, and the latter "one swallow does not make a spring" (Aristotle's *Nichomachean Ethics*). Hence the points made here and hereafter in the text remain valid.

**16.** Even though Title VII (quoted at the beginning of the next section) speaks in terms of discrimination because of an employee's "sex," courts from the Supreme Court (see, e.g., *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW v. Johnson Controls, Inc.*, — U.S. —, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991)) on downward frequently employ the "gender" locution instead. It is almost as though it is somehow viewed as sexist to speak in terms of "sex," even though that is the word Congress has chosen to employ. Whatever the reason may be for

speaking in terms of "gender" rather than the statutory language, this Court (assuredly without any motive other than consistency) will follow the lead of Justice Blackmun's opinion for the Court in *Johnson Controls* in predominantly speaking the same language as the statute. No criticism of the other usage is of course intended or implied—it is only necessary to read the language later quoted from the Supreme Court's *Price Waterhouse* decision to see that the terms are really treated as interchangeable.

**17.** Although the text both here and later speaks of what a plaintiff or Pepsi may or must "show" or "prove," any such locution must be understood in the Rule 56 context as imposing on either party the materially lesser burden of demonstrating a genuine issue of material fact in order to survive a motion for summary judgment by her or its opponent.

motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account.[18]

■ In other words, where it appears that the employer had mixed motives—one legitimate and one illegitimate—the ultimate burden then shifts to the employer to prove that its decision would have been the same without the illegitimate motive. At the outset, of course, it remains necessary to focus on the initial burden borne by plaintiffs. *Price Waterhouse, id.* at 250, 109 S.Ct. at 1790 (footnote omitted) elaborated on that burden:

> In saying that gender played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman.

Plaintiffs describe several incidents that they claim tend to show their sex was impermissibly taken into account by Pepsi in its decisions to lay them off.

### a. Layoff Procedure

■ First, plaintiffs argue that they, as the only women in the machine crew classification at the time, were picked out for differential treatment with respect to layoffs. Undisputed is the fact that only plaintiffs were laid off out of all of the members of the machine crew classification working on Line 3 on June 9, 1989 (Wei-

gand Dep. 70–71, P.Mem.Ex. J). In addition, Pepsi does not dispute that during plaintiffs' prior layoffs as well, less senior men in the machine crew classification were working.

Section 16.3, which outlines the layoff procedure, must be the starting point of the analysis. Pepsi reads Section 16.3 as though it said that to avoid layoff, an employee must *affirmatively exercise* bumping rights (1) within the machine crew classification or (2) if there is no position available there, then within the general plant classification, and in *either* case the employee can bump only someone of lesser seniority and *only if the employee is qualified* for the new position. However, Section 16.3's two-step approach to layoffs simply does not fairly allow for such a reading. It expressly mandates that if layoffs are necessary, the first step is that "employees with the least seniority in the job classifications to be reduced shall be removed from the classification." Barry agreed that seniority was the *only* factor to be taken into account at the point of deciding whom to lay off within the machine crew classification (Barry Dep. 43, D.Mem.Ex. I). In that case, there should never have been a situation where plaintiffs were laid off while less senior male machine crew employees continued to work positions in the machine crew.[19] However, that occurred regularly (see, e.g., Barry Aff. Attachment 2, D.Mem.Ex. Y).

This Court can and does say as a matter of law that Pepsi violated the specific and unambiguous terms of the Agreement in that respect. But that does not end the

**18.** [Footnote by this Court] Because that quotation is taken from Justice Brennan's opinion for a four-Justice plurality and because the majority ruling must depend on the concurrence of Justice O'Connor or Justice White or both, the term "motivating part" should be read as requiring the unlawful motive to have been a *substantial* factor in the adverse decision (see those concurrences, *id.* at 265 and 259, 109 S.Ct. at 1798 and 1795). That is the sense this Court will employ. Conversely, Pepsi's counsel prefer to find their law in dissenting opinions (D.R.Mem. 1, quoting from the three-Justice dissent in *Price Waterhouse*). That unconventional (and unpersuasive) approach is all of a piece with counsel's underscoring (D.Mem. 8) of an inapplicable por-

tion of Section 16.3—inapplicable, as discussed in the next section, because it applies only to employees displaced because of reductions in force and because plaintiffs' seniority in their machine crew job classification should have insulated them from such displacement in the first place.

**19.** It is important to note that it is "positions in the machine crew" and not *any* position, because it is possible that a male machine crew employee of lesser seniority might be working because he had been laid off and then bumped into the general plant classification.

inquiry. Because this is a Title VII case, plaintiffs must be able to show that—at least in part—it was *because of* their sex that they were laid off out of order. That determination must be left to the finder of fact,[20] who (at least on the record presented on the current cross-motions) could reasonably find either that the treatment was or that it was not impermissibly related to sex.[21]

### b. Comments in the Workplace

■ Plaintiffs next proffer, as assertedly direct evidence of discrimination, three separate comments in the workplace. First, Moore contends she was given a more difficult job in October 1989 after being told by her supervisor she was to do a "man's" job (Moore Aff. ¶ 13, P.Mem.Ex. F). Second, Maleske was called into the January 1989 meeting with Weigand only because, as Weigand said, "she works with the other women" (Ex. 12 of P.Mem.Ex. I). Third, later that same day Weigand told the women that "the girls should look out for the future" (Moore Dep. 40, P.Mem.Ex. D). This Court agrees with Pepsi that each comment alone does not suffice to support an inference of discrimination, the first being unrelated to the layoffs and the latter two appearing completely benign on their own.

But if the latter two comments are put into context, a fact finder could reasonably conclude that the women were routinely treated by management as a separate subgroup based upon their sex.[22] As Moore recalled the events surrounding the January 6, 1989 meeting between Weigand and Phaup, Moore and Maleske (Moore Dep.

32–40, P.Mem.Ex. D), she was told that Weigand wanted to see all the women in his office. She asked to be placed on the "sorting line" and said Weigand did not tell her that the only option they had for work was in the general plant classification, where they would have to build pallets as well as sort bottles. Later that day she received Weigand's letter (quoted in the "Facts" section of this opinion) stating (1) that she would have to be able to do all parts of the "general plant" jobs and (2) that if she were unable to do so her 40–hour weekly guaranty would be voided. She refused to sign it and asked Weigand for a copy to give to her lawyer. Weigand got upset and told her if she did not sign it she could not work. Later that same day Weigand came and knocked at the women's locker room door (*id.* at 40):

> He was trying to explain that this is the way things are now and that the girls should look out for the future and plan your future.

Then on January 26, 1989 Weigand called a meeting with Maleske, Fitzpatrick and Phaup. Weigand again explained how they would have to do all the general plant tasks if they wanted to work on the sorting line. Weigand recalled that Phaup and Fitzpatrick did all of the talking, and (Ex. 12 of P.Mem.Ex. I, notes of an interview of Weigand):

> Carol Malesk [sic] did not say much. She had not been complaining or saying anything about the layoff. I just brought her up here because she works with the other women.

Anyone reading all of the depositions and exhibits submitted by the parties as a

---

**20.** To be sure, this Court is also that ultimate finder of fact in this Title VII case, where there is no right to a jury trial. But this Court's inference-drawing role on summary judgment motions (see n. 5) precludes such a determination now. It is just this possibility that a material issue may fall between the cracks that regularly leads this Court to ask counsel, where cross-motions under Rule 56 are contemplated, to consider stipulating that this Court may resolve any material (that is, potentially outcome-determinative) evidentiary conflicts that appear from the record submitted by the parties. No such stipulation has been entered into here.

**21.** See also the related discussion later in this opinion that Pepsi's interpretation of Article 16.-3—that employees' qualifications and experience could be considered in choosing whom to lay off in the first instance and that it laid off plaintiffs due to their lack of requisite qualifications—might reasonably be seen as either pretextual or legitimate.

**22.** That conclusion of course is not direct evidence of discrimination, but it may certainly serve as indirect evidence that the layoffs were pretextual. Hence this discussion, although logically placed here, will be taken into account as part of the legal analysis in the next section.

whole could reasonably infer that at least Weigand thought of the women as a unit. Although with reasonable inferences in the other direction (favoring Pepsi) the statements described above do not in themselves constitute acts of discrimination, when they are taken with pro-plaintiff inferences and in combination with the layoffs, a factfinder could reasonably conclude that the women were treated as a unit based upon their sex, and that such treatment operated to their disadvantage.[23]

### c. Two Requested Written Statements

Plaintiffs also raise as claimed direct evidence of discrimination the two specific instances where two of them were asked to sign statements that men were never asked to sign. Both of those have already been mentioned in the "Facts" section, but some elaboration is called for here.

First is Barry's May 1987 action in asking Phaup and Fitzpatrick to sign a letter that said they did not wish to exercise their bumping rights to Line 2. Although they did both sign the letter, Fitzpatrick testified they were intimidated into signing it or they would not get vacation pay (Fitzpatrick Dep. 28–29, P.Mem.Ex. B). Fitzpatrick later recanted it. Barry's explanation is that she was simply trying to get a statement of their intention, because it was often difficult to know whether they wanted work or a layoff. Whatever the reason, two things remain true: No male employee was ever tendered such a statement, and Section 2.2 precludes the employer from making separate contracts with employees.

Second came the request that Phaup and Moore sign the statement giving up their rights under the Agreement to get paid for 40 hours for the week if they did not succeed in qualifying for general plant classification. Weigand stated his reasons for giving them that statement in these terms (Weigand Dep. 131–32, D.Mem.Ex. F):

A. [B]ecause they wanted to bump down, and they had gone into the warehouse previously and could not perform the job qualifications and they were sent home and they were paid for a full week's work.

 * * * * * *

Q. Now, you said they had gone to the warehouse previously and couldn't perform the job. How do you know that?

A. I was told by Pat.

Q. Pat Harris?

A. Yes.

Q. Did he inform you how he knew that?

A. No. Well, he had told me that once before. I can't recall which one or how many of the plaintiffs went down there and were requested to work as a GP [general plant], and they took the test— or pallet building test—and they couldn't perform to specifications. I don't recall who was down there—whether it was Shirley, Martha, Carol—but I know he told me that there was a check cut for 40 hours of work.

Even though it is very uncertain who actually took the pallet building test,[24] clearly Weigand's tendency was to lump the women together and assume they were all unqualified.[25] In any case it was plaintiffs' right under Section 6.1 to get paid for the 40 hours if they were available and willing to work, and it was not Weigand's place under Section 2.2 to contract separately with plaintiffs to void that provision. In this situation as well, no men were ever tendered such a statement.

There is no question that a factfinder reasonably could—but would not be compelled to—interpret events as tending to show that sex was a motivating factor in laying off plaintiffs and in not allowing

---

**23.** Once again see n. 20.

**24.** Harris believed, but was unsure, that Moore, Maleske and Fitzpatrick took a test in 1986 (Harris Dep. 142, D.Mem.Ex. A). Barry contends it was Maleske and Fitzpatrick (Barry Dep. 127, P.Mem.Ex. K). Moore says she never took one (Moore Dep. 58, D.Mem.Ex. B). Only

Fitzpatrick discussed having taken the test once, and that was in 1987 (Fitzpatrick Dep. 64, D.Mem.Ex. E).

**25.** Also see the later explanation in this opinion that the pallet building test could be viewed as a pretext for discrimination.

them to exercise their rights to bump into other positions in the same manner as the men. That is the stuff of which trials, and not summary judgments, are made.

In sum, plaintiffs have presented statements and events reasonably susceptible to alternative interpretations—benign as Pepsi urges, or impermissibly sex-related as plaintiffs contend. Genuine issues of material fact exist as to whether those matters constitute direct evidence of sex discrimination.[26]

### 2. *McDonnell Douglas–Burdine* Indirect Method

Plaintiffs' other alternative method of proof for violations of Title VII involves the indirect burden-shifting method of proof dictated by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) as rearticulated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). Although those cases and their progeny have consistently taught that the shifting burden is one of production and not of proof (which stays with the plaintiff), once the *McDonnell Douglas–Burdine* requirements are met *Price Waterhouse* and *its* burden-shifting doctrine may come into play as well.

■ In the indirect method, a plaintiff must first be able to make out a prima facie case of sex discrimination. That involves her showing that (*Jones v. Jones Brothers Construction Corp.*, 879 F.2d 295, 299 (7th Cir.1989)):

(1) she was a member of a protected class; (2) she was satisfactorily performing the duties of her position; (3) she was discharged; and (4) her employer sought a replacement for her.

Those elements, however, are flexible and may be adapted to the fact situation as appropriate (*McDonnell*, 411 U.S. at 802 n.

13, 93 S.Ct. at 1824 n. 13). For instance, "in a reduction-in-force case the plaintiff may establish the fourth element by showing that others not in the protected class were treated more favorably" (*Jones*, 879 F.2d at 299 (citations omitted)). In a somewhat different articulation, *Matthews v. Allis–Chalmers*, 769 F.2d 1215, 1217 (7th Cir. 1985) (per curiam) has approved the prima facie prerequisites as stated in *Williams v. General Motors Corp.*, 656 F.2d 120, 129 (5th Cir.1981) for reduction-in-force situations:

1) showing he was within the protected age group; 2) showing he was adversely affected, either through discharge or demotion; 3) showing he was qualified to assume another position at the time of discharge or demotion; and 4) producing circumstantial or direct evidence from which a factfinder might reasonably conclude that the employer intended to discriminate in making the employment decision in issue.

In this case the most appropriate form of the four-point inquiry depends upon the particular claim. For example, for plaintiffs' claim of sex discrimination in filling permanent job vacancies, the framework can be altered so that plaintiffs must show that they did not receive the positions although qualified, while a member of the unprotected class (a male) received the position (similar to a failure-to-hire situation). As for layoffs, plaintiffs must show that they were laid off even though qualified to remain employed, while those similarly situated (i.e., those in the machine crew classification) but not in the protected class to which plaintiffs belong remained employed.

■ If plaintiff makes out a prima facie case, the burden of production then shifts to defendant to articulate a legitimate, nondiscriminatory reason for its decision (*Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094). If

**26.** Two of plaintiffs' other three claims of direct evidence of discrimination will be addressed in the next section in their proper context, rather than being isolated here where they make little sense—those are the claims (1) that of the eight women who have ever been employed by Pepsi, none has ever been assigned to the general plant classification, and (2) that none of the plaintiffs has ever been selected by Weigand to fill temporary positions. Plaintiffs' third claim is not worth addressing anywhere, for it is not probative of any issue in this case that Al Reese, a supervisor, owes Phaup $1,000 but does not owe any male employees money.

defendant meets that burden, then plaintiff must prove that defendant's proffered reasons for its decision were a pretext for discrimination (*id.* at 253, 101 S.Ct. at 1093). *Jones*, 879 F.2d at 299 has said a plaintiff can meet that burden by "directly persuading the court that a discriminatory reason more likely motivated the employer or by showing that the proffered reasons are unworthy of credence"—but *Jones*, *id.* at 299–300 went on to reserve ruling on how *Price Waterhouse* (decided just two months earlier) would interact with that framework.

That then sets the analytical stage. This opinion now turns to plaintiffs' various claims.

### a. Permanent Job Vacancies

 Because Phaup, Moore and Maleske have not identified specific permanent job vacancies for which they applied and were refused, this Court will address only the claim of Fitzpatrick that she was unfairly denied job advancement based upon her sex.[27] Evidence has been presented as to two positions for which she applied: the Machine Operator Can Line position in August 1988 and the forklift operator position in June 1989.

In each instance, the most important criterion that Fitzpatrick must be able to show is that she was qualified, both to establish her prima facie case and thereafter to refute Pepsi's explanation—which it advances in both situations—that she was not qualified. Unlike the automatic operation of the layoff policy under Section 16.3, management could clearly take into account an employee's ability to perform the job in filling permanent job vacancies according to Section 16.2.

As to the can line job, Fitzpatrick trained for two weeks, after which her supervisors, Heenan and Weigand, decided that she could not handle the job physically. In that respect Heenan wrote a report giving a

detailed explanation of the problems that she experienced in training (D.Mem.Ex. K).

Fitzpatrick counters by contending that her training period was insufficient in comparison to the men and that her training required that she learn more aspects of the job than the men. But those claims are unsubstantiated by the evidence she presents (see also Barry Dep. 87–88, P.Mem.Ex. K (Barry says that men also trained for two weeks on all aspects of the job); Fitzpatrick Dep. 51–52, P.Mem.Ex. B (Weigand told her that the men also trained on all aspects, but she simply did not believe him)). Fitzpatrick admitted that she was not fast enough (Fitzpatrick Dep. 52, P.Mem.Ex. B), but she claims that the reason her performance was not as good as the men's was because they had the benefit of prior experience by filling in temporary openings (Barry Dep. 81–82, P.Mem.Ex. K reflects her admission that experience is gathered by filling temporary openings and is considered in filling permanent job vacancies). Plaintiffs contend that temporary openings were routinely filled by men at management's direction and were never filled by any woman. If it is true that women were routinely prevented from gaining experience, then it would indeed be unfair to make Fitzpatrick show that she was as qualified as the men.

It therefore becomes necessary to pause for a moment to discuss Pepsi's policy as to temporary openings. It is difficult to know exactly the nature of that policy, given the managers' differing descriptions. Harris testified that temporary openings were filled by those who had qualified *previously* for the position by signing a bid sheet to train for that position and by then training for it (Harris Dep. 186, D.Mem.Ex. W). However, in crisis situations the openings were filled by employees selected by Barry (*id.* at 187). Alternatively, Weigand testified that temporary openings were filled on

---

**27.** Indeed, any discussion of that subject gives plaintiffs credit for a claim they have not properly advanced—only plaintiffs' layoffs were specified in their Complaint, but many other claims appear to have found their way into plaintiffs' briefs. In light of the ensuing deter-

mination that there is no genuine issue of material fact left to be decided on Fitzpatrick's claim in that respect, this Court need not decide whether plaintiffs should be allowed to amend their Complaint to plead the claim.

a strict seniority basis (Weigand Aff. 145, D.Mem.Ex. U):

> The next person on the seniority list would go to that position. If it was a day shift machine crew operator, machine crew person, when he would go on vacation the next person with the next amount of seniority would fill his slot and then it bumps all the way down.

Weigand also simply asked people to fill in for temporary positions over which he had control, and he never selected any of the plaintiffs to fill in for any job other than their bottle inspecting job (Weigand Dep. 93, P.Mem.Ex. J).

Plaintiffs have not proffered any evidence that any of them either expressed a desire to her superiors to fill those openings or signed bid sheets as described by Harris. This Court has nothing concrete upon which it could find that the temporary-opening policy was implemented in a discriminatory manner. It finds that any possible connection between that policy and Fitzpatrick's failure to qualify after two weeks of training on the can line—if connection there was—would be too attenuated to serve as evidence of pretext. This Court is not in a position to second-guess management's decision that Fitzpatrick could not handle the job after watching her for two weeks and making specific notations of her poor performance. There is no evidence that management used her lack of qualification as a pretext for discrimination based upon her sex. In fact, Fitzpatrick admits that Weigand said to her (Fitzpatrick Dep. 51, P.Mem.Ex. B), "Don't feel bad that you are not doing these jobs—you did not get these jobs that well because we have three guys in the warehouse that tried out for it and they couldn't do it either." No inference of sex discrimination can be drawn.

Fitzpatrick also bid on but was not awarded the forklift operator position. She had no prior forklift experience, but she claims there was no requirement of such prior experience. However true that may be, it was the prerogative of manage-ment to take prior forklift experience into account and to award the positions as it did to those who knew how to operate a forklift. To be sure, that prerogative might be tainted by any demonstrated sex discrimination on Pepsi's part in making that prior experience available. To that end Fitzpatrick argues that all five men selected had prior experience because they had previous opportunities to train that she did not have (Fitzpatrick Dep. 109, D.Mem.Ex. E). But that claim too is unsubstantiated, and this Court finds that no genuine issue of material fact exists to prevent an entry of summary judgment on that claim as well.

### b. Layoffs

■ As for plaintiffs' claims based on their repeated layoffs, once again the crux of the analysis is that plaintiffs must show that they were qualified—but in this instance, qualified to remain employed at all. As that distinction suggests and as Section 16.3 confirms, however, here "qualified" takes on a very different meaning. Plaintiffs had a right to remain employed in the machine crew classification as long as there were still any less senior employees in that same classification, for the Agreement compelled the layoff of those junior employees rather than plaintiffs. Hence plaintiffs have made out a prima facie case of sex discrimination in every layoff situation where less senior men in the machine crew classification continued to work in the machine crew.

Pepsi's explanation for its treatment of plaintiffs is based upon its asserted interpretation of Section 16.3, under which the women were not "qualified" (in the traditional sense of the word) to work in other positions in lieu of layoff. That explanation might perhaps be seen as legitimate—even though it is clearly erroneous in contractual (and plain English) terms—*if* Pepsi could demonstrate that its nonadherence to the express and unambiguous terms of the Agreement was not based upon sex discrimination.[28] And it should be kept in

---

**28.** Matters would seem to be complicated further by the fact that the provision at issue is part of a collective bargaining agreement—something that Union is duty-bound to enforce in a

mind that Barry, who had the administrative responsibility for implementing those terms, testified that the *only* factor for determining the sequence in which layoffs were ordered within a job classification (such as machine crew) was the employees' relative seniority within that job class (Barry Dep. 43, D.Mem.Ex. I).

In practice, layoffs occurred pursuant to Barry's weekly crewing decisions. In the latter part of each week, after Weigand had determined how many lines were running the next week, Barry would "crew" employees for work the following week. That involved preparing a list of who was working where (the "crewing plan") and a list of who was laid off, and Barry would then post the lists (Weigand Dep. 248, D.Mem.Ex. F). Weigand described those decisions [29] as "cut and dry" (*id.* at 254):

> We have—as you see in our seniority list—a number of people that have a lot of years with the company and Carol knows by heart what their feelings are as far as whether they want to go into the plant and pallet—you know, stack pallets or stack cases for pallet make-up.

Based upon "past history," Barry would assume plaintiffs wanted a layoff or vacation in lieu of pallet building (or "make-up" work, as it was called) in the general plant

(*id.* at 258).[30] Each time plaintiffs were laid off, they were told that their only choice of work was in the general plant classification on second or third shift and that it would involve building pallets, a job for which they must qualify.

Plaintiffs do not disagree that they repeatedly refused to do make-up work and they admit to being physically unable to perform it, but they have presented evidence from which a trier of fact could reasonably conclude that the "make-up or layoff" choice was a ruse. Plaintiffs have shown that several male employees in the general plant classification either (1) do little or no make-up work (Harris Dep. 28, P.Mem.Ex. L; Barry Dep. 134, P.Mem.Ex. K) because it is not a major portion of the job or (2) lack other qualifications for the classification (such as reading or driving, Threatt Dep. 26–28, 50, P.Mem.Ex. N) or (3) were never made to take a qualifying test (Hambrite Aff. ¶ 5, P.Mem.Ex. Q). No women have *ever* been in the general plant classification—in 1985 Pepsi administered a simulated pallet building test, which was failed by all four women who took it and was passed by all men taking the test (D.Mem.Ex. J). Due to the pallet building requirement, then, plaintiffs were effectively prevented on a permanent basis from bumping down into the general plant classi-

---

manner protecting the rights of *all* its constituents. That concept always carries the potential for problems where—as is often the case—the rights of some of those constituents come into conflict with the rights of others. And the situation here, with plaintiffs making up a small minority group, would appear especially problematic in that respect.

**29.** Barry had virtually complete discretion in those decisions (Barry Dep. 20–21, D.Mem.Ex. V).

**30.** One graphic example of the lack of communication and false assumptions that infected such a discretionary and unsupervised procedure is provided by the circular reasoning Weigand used to support his understanding that the plaintiffs wanted to take a layoff rather than work on June 9, 1989. Weigand said he did not know what the reasons were, "but they took the layoff" (Weigand Dep. 57–58, P.Mem.Ex. J):

> A. They indicated they wanted to take a layoff as far as I know.

Q. They said, "I want a layoff rather than bumping down"?
A. They would take the layoff rather than bump down.
Q. When did they say this?
A. I would assume they talked to Carol about it.
Q. You just said they indicated they wanted to take a layoff, correct?
A. Correct.
Q. When did they say this?
A. They would have to tell Carol, because we would keep them working.
Q. How do you know they said they wanted to take a layoff?
A. Because Carol did not crew them.

But that is flat-out wrong. Each plaintiff (except Moore who was on vacation) stayed after the June 9th meeting and indicated her desire to work, although refusing a general plant class job that involved make-up. Weigand admitted later in his testimony that plaintiffs had made such a request and that he never transmitted to Barry their desire for work (*id.* at 78).

fication in the event of a layoff.[31]

Whether Pepsi requiring qualification for make-up at the expense of all other work opportunities was a legitimate explanation for excluding plaintiffs from bumping down into the general plant classification, or was instead a pretext for discrimination, is a question of fact best left for trial. Furthermore, whether Pepsi's misapplication of the terms of the Agreement in deciding whom to lay off in the first instance was based upon an impermissible singling out of the women employees is likewise a question of fact—and one on which Pepsi must explain away both the Agreement's plain language and why Barry did not implement her apparently accurate understanding of that language.

### Constructive Discharge

■ Finally, plaintiffs assert two constructive discharge claims. Although those were not set out in the Complaint, both parties have addressed the claims, so this Court will as well. Because this opinion decides that no genuine issue of fact exists to save that claim from summary judgment, there is no need to consider the amendment of plaintiffs' Complaint to add this claim.

Plaintiffs describe a day in October 1989 when Maleske trained for the "depalletizer/uncaser" job on Line 2.[32] On October 23, 1989 Maleske reported to Al Reese ("Reese") as the supervisor that day for the job. Moore noted that Reese (Maleske Dep. 125–26, D.Mem.Ex. FF) "had a mean look on his face," and a mechanic asked her (*id.* at 124) "Oh, are you their next victim?" Moore trained Maleske for five hours, after which Reese asked Maleske to do the job by herself. She had a problem with the machine and was forced to jump back and

forth over the line. Reese yelled at her, telling her to get away while he performed her job for 20 minutes. Because the problem continued, he called a mechanic to fix the machine. She went back to work and then noticed that the pallets were all going sideways and the bottles were about to fall. Not knowing what to do, she called Reese over. He became upset and replaced her with another employee. He called her into his office and told her what she was doing wrong, that she was too heavy for the job, and that he could make her hand stack if he wanted. Maleske finished the shift and told Reese she would not be returning the next day. She followed up with a letter to Reese that said the job was too physically demanding. When Barry later called Fitzpatrick to train for the same job, Fitzpatrick refused, telling Barry that she did not want to be "set up" like Maleske.

Plaintiffs contend that those events amount to constructive discharge of both Maleske and Fitzpatrick. According to *Rutan v. Republican Party of Illinois*, 868 F.2d 943, 950 (7th Cir.1989) (en banc) (citations omitted), *rev'd on other grounds*, —— U.S. ——, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), the focus in constructive discharge cases is whether a reasonable person in plaintiff's position would feel compelled to leave her job:

> In the course of most, if not all, people's employment a wide variety of disappointments, and possibly some injustices, occur. Most of these are normal incidents of employment that would not lead a reasonable person to quit.

In other words, "[a]n employee may not be unreasonably sensitive to his working environment" (quoted by *Brooms v. Regal Tube Co.*, 881 F.2d 412, 423 (7th Cir.1989) from *Johnson v. Bunny Bread Co.*, 646

**31.** Furthermore, Pepsi contends that plaintiffs were unqualified for all positions other than general plant classification because they had no prior experience. However, that remains a question of fact: In the past, plaintiffs worked temporarily at jobs other than bottle inspectors, and Moore's continued employment on Line 2

in a capacity other than bottle inspector belies Pepsi's contention.

**32.** All of the following is from Maleske's Deposition (Dep. 119–63, D.Mem.Ex. FF). Pepsi describes the event somewhat differently, but Mal-

F.2d 1250, 1256 (8th Cir.1981)).[33]

Plaintiffs' claims that Reese was hostile are precisely the kind of "disappointments" (or even, though that has not been established here, "injustices") that reasonable people endure on the job—mean stares, criticism of performance, and now and then an unfortunate statement such as that a person is too heavy for the job. None of those—either separately or combined—creates or create working conditions so intolerable as to force a reasonable person to quit. Even if Reese were "a heavy-handed manager who dealt poorly with subordinates[, t]hat kind of manager is (unfortunately) not a rare breed, and simple mismanagement does not constitute constructive discharge" (*Miller v. State of Illinois*, 681 F.Supp. 538, 544 (N.D.Ill.1988)).

Although the working conditions reflected in the record may not have been pleasant, they were not so intolerable as to force a reasonable person to quit. And as to Fitzpatrick, who was not herself subjected to the complained-of treatment, her claim is so attenuated as to make it non-actionable in any case. Plaintiffs have failed to create a genuine issue of material fact to support the claim that Maleske or Fitzpatrick was constructively discharged.

### Conclusion

Because there is no genuine issue of material fact as to Fitzpatrick's claims that Pepsi violated Title VII in denying her both the Machine Operator Can Line position and the forklift operator position, Pepsi's motion for summary judgment is granted and those claims are dismissed with prejudice. Similarly, as there is no genuine issue of material fact as to Maleske's or Fitzpatrick's constructive discharge claims, those claims are likewise dismissed with prejudice. However, because numerous genuine issues of material fact exist as to plaintiffs' claim that Pepsi violated Title VII in laying them off repeatedly since May 1987, both motions for summary judgment are denied as to that claim. This action is set for a status hearing at 8:45 a.m. April 15, 1991.

### APPENDIX

This Court's laborious combing through of the parties' submissions has confirmed—at the expense of a great deal of effort on the part of this Court's law clerk Janet Hoeffel in the first instance and then on the part of this Court independently—what seemed painfully obvious from appearances alone: No summary judgment motion should have been launched here in good conscience by either side. Whenever a court is confronted with nearly 70 pages of briefs[1] from each side of the litigation, supplemented by more than six inches of evidentiary submissions,[2] the notion that no material factual issue will emerge from the paper blizzard would seem a remote prospect at best. And as this Court's written opinion has confirmed, that prospect has proved more than remote. All that has resulted instead is a major imposition on this Court's time (something that pro tanto disadvantages the litigants in other cases on its calendar) and a long opinion that should never have been required to be written.

Just what Pepsi's counsel hoped to accomplish by the all-embracing scope of the initial motion is hard to fathom. In all likelihood the total time that they spent on the motion has had to approach the time that would have been devoted to preparing the case for trial and trying it. And to the extent that the time may not have been

---

eske will be given the benefit of the doubt for the sake of discussion.

**33.** *Brooms,* for example, decided that a reasonable person would quit her job if she were in the position of a black female whose male supervisor showed her an extremely offensive photograph of racist pornography involving bestiality, told her that was how she "was going to end up," and grabbed her and threatened to kill her when she tried to seize the photograph.

**1.** "Briefs" is an obvious oxymoron.

**2.** It was not worth even more effort to try to approximate the page count, and a scale was not handy to weigh the evidence (literally? figuratively?), so a ruler supplied the most plausible alternative.

*fully* equivalent, the game was not worth the candle: In terms of marginal utility, the known overwhelming likelihood (if not absolute certainty) of failure on the summary judgment motion could not justify the extra work involved in preparing the motion *and* in conducting the inevitable trial.

Plaintiffs' cross-motion was just as inevitably doomed to fail, although at least plaintiffs' counsel was reactive rather than initiative in bringing that counter-motion. Maybe the reasoning there was that as long as one untenable motion had been filed, the best way to show its emptiness was to file an untenable motion on the other side.

This Court has commented elsewhere that the most scarce commodity in the justice system is judges' time. Law clerks' time runs a close second. In this instance Ms. Hoeffel had the unenviable task of trying to separate the wheat from the chaff in the first instance.[3] That task was performed admirably, although necessarily with the expenditure of a great deal of time. It furnished a far better degree of organization and marshaling of the facts than the parties' mass of detail had provided.

Then this Court necessarily had to plow the same fields, though the task was proportionately eased by Ms. Hoeffel's good work.[4] And to what end? To demonstrate, as had seemed most likely from the beginning, that the work had been uncalled for. That is doubly unfortunate where (as is necessarily true in Title VII cases and all others that require bench rather than jury trials) if this Court had done exactly the same work in the matrix of a trial, that work would assuredly have been constructive by producing a final decision.

Rule 11 has come under a great deal of scrutiny and a substantial amount of both criticism and praise—not all of it on either side of the issue justified. That Rule certainly plays a constructive role in putting a premium on lawyers' thinking throughout every phase of their lawsuits before they file documents with the court.[5] What Rule 11 unfortunately does not do is to take account of the court itself as victim. All that a court can ordinarily do is to hope that parties will be more mindful of the kinds of considerations spoken of in this Appendix.

---

3. Given the bulk of the submissions, maybe a better metaphor would refer to panning the contents of the stream bed comprising the parties' submissions to discover whatever gold those submissions might contain.

4. As this Court is invariably careful to point out when giving tribute to the work of one of its always outstanding law clerks, this Court remains ultimately responsible in every instance—it reads each case cited in each of its opinions, and it reworks every sentence of any clerk's suggested draft opinion. If any errors are found in this opinion, they are perforce ascribable to this Court and not to Ms. Hoeffel.

5. Early the life of revised Rule 11, shortly after adoption of the 1983 amendment that added the requirement of objective good faith to the old improper-purpose standard, this Court imposed sanctions on a party for an obviously unwarranted and improvident summary judgment motion (*SFM Corp. v. Sundstrand Corp.*, 102 F.R.D. 555 (N.D.Ill.1984)). Such an imposition would seem inappropriate here, for in this case *both* sides have been offending parties (though Pepsi did come first and its counsel might thus be viewed as more culpable).