Shirley Anne WHITE, Plaintiff,

v.

DIAL CORPORATION, Defendant.

No. 91 C 6058.

United States District Court,
N.D. Illinois,
Eastern Division.

May 18, 1994.

Vickie L. Pasley, Vickie Pasley & Associates, Chicago, IL, for Shirley Anne White.

Grady B. Murdock, Jr., Earl L. Neal & Associates, Marc R. Jacobs, D'Ancona & Pflaum, Chicago, IL, for the Dial Corp.

Sally A. Stix, Chicago, IL, for Local 100–A United Food & Commercial Workers Intern. Union AFL–CIO.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Shirley Anne White ("White") has sued her employer Dial Corporation ("Dial"), charging that she has been the victim of sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 ("Title VII").[1] Although never actually terminated, White contends that her supervisors and fellow employees made her working environment so miserable that she was forced to transfer from her job in the traditionally-male Chemical Processing Department ("Department") to another department in Dial's facility. White asserts that she suffered disparate treatment in such matters as safety training and salary increases as well as verbal harassment.

Dial has responded with a Fed.R.Civ.P. ("Rule") 56 motion for summary judgment. Because White has not demonstrated the existence of any genuine issues of material fact, and because the material facts compel a judgment in Dial's favor, its motion must be granted.

---

1. That is the only remaining claim in this action. Over two years ago (in April 1992) this Court dismissed White's other claims against Dial as set out in her Third Amended Complaint ("TAC"), as well as dismissing Local 100–A of the United Food and Commercial Workers Int'l Union, AFL–CIO ("Union") as a defendant (it had been named in TAC Count III).

## Factual Background [2]

White has worked at Dial's Montgomery, Illinois soap-making facility ever since February 1975 (D. 12(m) ¶¶ 4–5). Though she had stints in various departments, the bulk of her tenure has been spent in the Soap Finishing Department: She worked there until January 30, 1989, when she successfully bid onto the job of A–5 Operator in the Department (*id.* ¶¶ 6–7). White was the sole female A–5 Operator until March 27, 1989, when Arlene Dougherty ("Dougherty") [3] came on board (*id.* ¶¶ 27–28). Dougherty still holds that job (*id.* ¶ 30).

A–5 Operators are responsible for a wide variety of diverse tasks, such as unloading raw materials from train cars, pretreatment of fats and oils for processing, carbon treatment and filtration of refined glycerine, and operation of all kinds of tools and equipment (P.Ex.III). P. 12(m) ¶ 19 acknowledges that White was trained for those tasks on the job by co-workers John Stathis ("Stathis"), Carl Cox ("Cox"), Lorenzo Beach ("Beach") and someone whom she calls "Juan Rodriguez" ("Martinez" [4]). She worked under a number of supervisors, but most commonly on a shift overseen by Daniel Huber ("Huber"). During her 2½ months as an A–5 Operator White received no raises in salary, earning the training rate of $13.79 throughout (White Aff. ¶ 4).

As will be explored more fully below, the employment relationship between White and Huber was one that she found distressing. Because she says that her working conditions were intolerable, White eventually bid off the Department job voluntarily on April 17 and transferred to a job as a bander back in the Soap Finishing Department. White asserts that while in the Department she was verbally abused, forced to perform mundane tasks and discriminatorily denied breaks, adequate safety training and the pay raises that she felt were her due.

After her claim was denied by the EEOC, White obtained a right-to-sue letter on June 24, 1991 and brought this action in timely fashion. After a few false starts, the TAC sought to couple White's claim of sexual discrimination (Count I) with a second count charging Dial with negligent infliction of emotional distress (brought under the supplemental jurisdiction provision of 28 U.S.C. § 1367) and with a third count titled "Discriminatory Representation/Failure to Represent," brought against the Union. As n. 1 reflects, Counts II and III are long gone from the case. That leaves only Count I and the current motion for resolution.

## Summary Judgment Principles

Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required

---

**2.** This section of the text provides a skeletal backdrop for the substantive discussion that follows. Other facts will be set out later, where most relevant to that substantive discussion. As for the record citations in this opinion, this District Court's General Rule ("GR") 12(m) requires every Rule 56 movant to submit a statement of allegedly uncontested facts accompanied by supporting record citations. Dial has submitted its statement (cited "D. 12(m) ¶—") consistently with that mandate. GR 12(n) requires the nonmovant to respond point by point, with record citations in support of (1) any claimed dispute as to the movant's version of the facts and (2) any additional facts the nonmovant chooses to assert. Instead of following that rule, White's counsel has tendered what she calls her own "12(m)" statement (cited "P. 12(m) ¶—"). That defeats the whole purpose of the carefully crafted GR 12, which is intended to train a searchlight on any factual differences between the parties and thus to facilitate the court's determination of which (if

any) of those differences might be viewed as material (that is, outcome-determinative). What White has done instead as part of her "P. 12(m)" is to repeat many of the D. 12(m) paragraphs, sometimes without change and sometimes in revised form. That has thrust on this Court the onerous burden of comparing the two submissions word by word—a total subversion of the goal of simplifying the handling of Rule 56 motions.

**3.** That is the most common spelling in the parties' submissions, though White also refers to her both as "Doughtery" (White Mem. 2 and 8) and "Douherty" (*id.* at 12).

**4.** This name is used because White's lawyer is almost certainly referring to Juan Martinez, whom she has evidently merged with Raymond Rodriguez. This is just one instance of the regrettably sloppy work product on the part of White's counsel.

to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to non-movant White (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). While "this general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 370–71 (7th Cir.1992)), that does not foreclose the potential for summary judgment in such cases (*Washington v. Lake County,* 969 F.2d 250, 254 (7th Cir.1992)). Moreover, "a plaintiff facing the prospect of summary adjudication cannot 'sit back and simply poke holes in the moving party's summary judgment motion' " (*Young In Hong v. Children's Memorial Hosp.,* 993 F.2d 1257, 1261 (7th Cir.1993)).

### Analytical Format

 Under the now-familiar framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–93, 67 L.Ed.2d 207 (1981), White must first establish a prima facie case of sexual discrimination.[5] If she did so, that would create a presumption of unlawfulness and would shift to Dial the burden (of production, not of persuasion) to advance a "legitimate, nondiscriminatory" explanation for the adverse employment action (*St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——————, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993)). And if Dial could produce evidence to that effect, White would then have the burden of production (as well as her always-present burden of persuasion) to show that Dial's proffered explanation was merely pretextual (*Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94).

 In this case there is no need to carry the analysis beyond the initial step—the prima facie case—because White cannot surmount it. To establish a prima facie case of sexual discrimination, White needs to show that (1) she belongs to the statutorily protected class of women employees; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly-situated male employees (*Hughes v. Brown,* 20 F.3d 745, 746–747 (7th Cir.)). It is unnecessary to discuss the first two factors, the first because it is so obviously satisfied and the second because a moment's thought tells us the same.[6] But White fails on each of the other two factors, even with all reasonable inferences drawn in her favor. This opinion therefore proceeds directly to those elements of the prima facie case.

### Adverse Employment Action

 As a threshold matter, this third factor presents an interesting problem for White. Because she voluntarily elected to "bid off" of her position as an A–5 Operator to return to her former job, the only way in which White could establish an adverse employment action by *Dial* would be in constructive terms—that is, by showing an action on her part ascribable in law to Dial's conduct. White's Mem. 4–5[7] discusses the components of a constructive discharge claim, but that label is inapt because White never left the company. To prevail White would instead need to prove a constructive involuntary transfer (a transfer laid at Dial's doorstep in the causal sense) that was adverse to her. Although the parties have not pointed to any cases expressly dealing with

---

5. Although this opinion speaks in terms of what White must "establish" or "prove," echoing the case law in that respect, her burden on Dial's Rule 56 motion is the lesser one of demonstrating at least a material factual issue on each aspect of her prima facie case. Whenever any of the case-law language is echoed here (rather than this opinion's constantly repeating the lengthier and more awkward Rule 56 locution), it should be understood in the less onerous sense, for this Court has in fact applied that less demanding standard.

6. That second factor may be inferred from the very fact that White was not fired for ineptitude (*Darnell v. Target Stores,* 16 F.3d 174, 177 (7th Cir.1994)).

7. White's Memorandum contains two pages bearing the number "1." This opinion will cite to White's mislabeled numbers instead of the actual pagination.

that situation (nor has this Court been able to locate any on its own), both sides discuss the case law surrounding constructive discharges, a rubric that is clearly analogous for analytical purposes.[8]

It is certainly problematic to suggest that White's transfer to a much more cushy job (White Dep. 433)—she went from handling caustic chemicals in sub-frozen temperatures to one of the easier jobs in the company— constituted a "constructive involuntary transfer" that was "adverse" to her. "Adversity" of the transfer was also somewhat questionable in financial terms. White testified at one point that she now earns $15.38 at her new job (id. 502).[9] Although she speculated that she thought she could have made $16.82 as an A–5 operator (id.), that is at best an estimate of what White could have earned had she progressed up the pay scale.[10] When she transferred out White was actually making only the training pay rate of $13.79 (White Aff. ¶ 4).[11] In summary, White's salary in fact increased after her so-called "constructive involuntary transfer" to a job that she considered, in her own words, one of the "easier ... jobs out there" (id. 433).

All of this creates a major doubt whether drawing an inference in White's favor on the constructive involuntary transfer issue would be reasonable (see Bank Leumi, 928 F.2d at 236). Nevertheless this opinion will give White the benefit of that doubt, drawing the possibly unreasonable inferences (1) that White suffered monetarily considering what she could have earned and (2) that the job to which she transferred was perhaps of less stature and challenge. Neither party addressed those matters fully, so this Court is reluctant to cut off examination of the "adverse employment action" claim at the threshold.

 Constructive discharge is a judicially-created doctrine to provide recompense where "working conditions were so intolerable that a reasonable person would have been compelled to resign" (Chambers v. American Trans Air, Inc., 17 F.3d 998, 1005 (7th Cir.1994)). But intolerability alone does not suffice, absent an additional showing of a connection between the unbearable circumstances and the plaintiff's sex (id.) ("conditions, even if intolerable, do not give rise to a cause of action under Title VII" without that link). Moreover, "[a]n employee must seek legal redress while remaining in his or her job unless confronted with an 'aggravated situation' beyond 'ordinary' discrimination" (Rodgers v. Western–Southern Life Ins. Co., 12 F.3d 668, 677 (7th Cir.1993), repeating the Brooms v. Regal Tube Co., 881 F.2d 412, 423 (7th Cir.1989) quotation from Bailey v. Binyon, 583 F.Supp. 923, 929 (N.D.Ill.1984)). Here White has failed to show even "ordinary" discrimination, much less aggravation.

To assess the severity of White's situation, this opinion will examine her allegations (Complaint ¶¶ 9–10) that she was harassed, denied adequate training and a pay increase and told that her position was not a woman's job. White's Mem. 2 proclaims that "[d]efendant's action [sic] and failure to rectify the above instances created an unpleasant and intolerable work environment for Plaintiff." This Court has waded through the entire record (an examination aided by the framework that has been reconfirmed for the review of "hostile environment" claims in Rodgers, 12 F.3d at 674, but with very little assistance from White's counsel in pointing to specific evidence of any disputed issues of

8. Dial's discussion is at its Mem. 7–12 and, much more briefly, its R. Mem. 4. Its reply there argues that no such theory has been recognized by the reported cases, but that contention (though accurate) is wholly unpersuasive as a legal defense to White's claim. After all, an employer's adverse action can take the form of transferring an employee to a less favorable assignment, just as it can take the form of the ultimate sanction—firing the employee. And a nominally voluntary transfer that is really driven by the employer's misconduct can fairly be labeled as "constructively involuntary," just as

may be said of a nominally voluntary decision to quit that is really employer-driven.

9. At an earlier point (id. 146) she said that she was making either $15.01 or $15.04.

10. As of August 27, 1990 the top rate available for an A–5 Operator proficient at all tasks was only $15.24 (Dial Mem. Ex. B at 0000051).

11. White acknowledged (Dep. 269) that the pay scale in the Soap Finishing Department was higher than that.

material fact). Though White's working conditions may very well have been somewhat "unpleasant," there is simply no evidence that her treatment rose (or descended) to the level of being intolerable. What follows addresses what appear to be the primary points raised in White's memorandum.[12]

### 1. "Too Much Safety"

One facet of White's harassment claim is the notion that she was continually followed and monitored by Huber, a charge that Huber does not deny. White herself cites to a portion of Huber's deposition (Dep. II 31, 32–33) where he explained that as a supervisor it was his responsibility to observe A–5 operators for safety reasons as they performed their duties around the plant:

> My job would be to account for the amount of time that that individual was on shift and what they were doing, which would account for the entire period of time that they were there
>
> * * * * * *
>
> I mean I—employees in training have to take—have special attention so that in case they would have something happen to them somebody is there.

Even if such conduct on Huber's part were somehow offensive (as White has not shown), White's contention still fails because she has offered no evidence that she was treated differently from any other employee in that respect. White argues only that none of the male employees expressly *stated* that they were followed (she cites each of their depositions "see generally," without any page references), but she points to no testimony saying that the males were *not* similarly monitored.[13] Thus Huber's testimony that he observes all trainees for safety purposes stands uncontroverted.[14]

### 2. "Too Little Safety"

Paradoxically, White's next quarrel with the quality of her work environment is that Dial purportedly cared so little for her security that she was deprived of adequate safety training. In a vain attempt to bolster that assertion, White's Mem. 10 relies heavily on an incident that occurred during her first week on the job, when she was splashed with hot steam while undoing a trap door.[15] But White's own Dep. 31, 32, 34–37 exposes the emptiness of that claim:

> White: Juan Martinez was training me. And he told me to open up a trap under the train. The trap was not right. So when I opened it up, the steam blew up from the train.
>
> * * * * * *
>
> Q: And Mr. Martinez had been assigned to train you?

---

12. *Young In Hong*, 993 F.2d at 1261 follows the dictates of *Celotex*, 477 U.S. at 322–26, 106 S.Ct. at 2552–54 in limiting a court's obligation to undertake the litigant's burden of fleshing out her own arguments. Perhaps because White's counsel has not exhibited a grasp of the relevant legal analysis governing her claim, her Memorandum makes no attempt to distinguish between arguments that go to the allegedly hostile conditions of her working environment and those that relate to her purportedly discriminatory treatment. This opinion will do its best to bifurcate those strands, first dealing with White's intolerable-conditions arguments as they relate to her claimed constructive involuntary transfer, and then later examining White's allegations of discrimination.

13. Dial R. Mem. 11 counters that "no A–5 Operator was asked about the degree of supervision received by [sic—should be "from"] Huber during their respective training periods," although Martinez testified to a heightened degree of scrutiny during his training period (Martinez Dep. 19–20).

14. White also refers obliquely to a fear that Huber might follow her into the bathroom (White Mem. 12, quoting her Dep. 357):

> There was times when I was—I was scared outside when he would come up behind me and I didn't know he was there. I didn't know was he going to come in the bathroom with me or not. I didn't know. It was always fear. I was just scared.

Asked if Huber ever actually did follow her into the bathroom, White admitted that he had not (*id.* 357–58), and nothing in the record suggests he had ever done anything even remotely comparable. White's entitlement to reasonable inferences does not justify her tossing out such blatantly unsupported assertions.

15. White was wearing a protective rubber suit at the time, and she concedes that she was not injured (White Dep. 38–42).

A: Yes.

\* \* \* \* \* \*

Q: In your discussions on Monday [her first day of work] about what the process of the job was, did anyone instruct you regarding the steps you had to take to pump the material out of the train car?

A: Yes.

Q: What were you told about the steps that you had to go through?

[White provided a detailed explanation of precautions covering the next two pages of transcript.]

Q: Who explained this whole procedure to you?

A: Juan. That's who was doing the job.

Q: And he had explained this procedure to you prior to the incident on Wednesday?

A: Yeah. We went through the—I was just to follow him and do what he did. So I really didn't—he didn't explain everything to me. I was just to follow him and do what he did. He was showing me what to do and I was just doing it.[16]

Basically, he did not tell me that this would blow up because he didn't know. He wasn't really properly trained either. So he didn't know about the trap, that the trap door could be that way.[17]

Whatever else that testimony might be suggested to establish, it surely does not support a sex-discriminatory denial of adequate safety training. Similarly, White's Mem. 10 is entirely misleading when it declares:

Juan Martinez confirms that he did not tell [White] the correct position for loosening the steam hose, which led to this accident.

Not only did White testify that at the time of the accident she had been squatting, which she acknowledges was the proper procedure

(White Dep. 38), but the portion of the record that White cites (Martinez Dep. 29–30) in no way backs up her version of the story. What Martinez really said quite clearly was that there is no right or wrong way to loosen a steam hose and that "it is up to the individual, you know, how if they feel—whatever position is comfortable for them, you know, to do it in that position" (*id.* 36–37). To characterize Martinez's testimony as White has done is one more example of a mischaracterization of the deponent's words at worst and a wholly unsupported statement at best.

White's theory that the withholding of safety training demonstrates a prevailing hostility to her presence is further scotched by Martinez's uncontroverted testimony that he personally trained White "for about a month" (Martinez Dep. 30) and by Huber's equally uncontroverted testimony that he discussed training and safety techniques with White on a daily basis. White's short convoluted argument (White Mem. 10) as to why Huber's testimony on this point is "suspect" is analytically impenetrable. Under these circumstances, no issue of material fact remains to be resolved.

*3. Denial of Breaks*

Another of White's charges as to her work environment is that "she was denied breaks during her eight-hour work shift, unlike similarly situated males in that position" (White Mem. 2). But that accusation too is without support in the record. White's lone citation relevant to the point is to her Dep. 63, 64, 66 and 76, but examination of that testimony reveals that White discusses a single night early on in her training where she was informed that she would not be able to break until she finished certain tasks. White herself clarified that she was told, "If you get through with these trains, maybe you can

---

**16.** [Footnote by this Court] White later explained (Dep. 173) that Huber instructed Martinez to " '[s]how her how to break down the tracks. And you are not to do the actual work' .... 'You are to let her do it for hands on training.' " When asked whether Martinez showed her how to break down the train, she responded (*id.*):

> Yeah. He told me that this is what you do. You take this inlet out. You take this hose off. He was more or less showing me what to do.

**17.** [Footnote by this Court] Earlier (*id.* at 34) White had stated:

> That's why it blew up because they hadn't showed me that the trap was going to be broken and not working properly.

That dubious reasoning, under which that supposedly establishes a sex-discriminatory denial of adequate training, is illustrative of the tack taken throughout this case.

take a break then" (White Dep. 64, 69).[18] And White concedes that she was indeed given a 15–minute break on that night after she completed her duties (id. 68) and that she regularly received breaks on shifts thereafter (id. 74). To the same effect, Huber testified that 90 to 95% of the time White had the authority to decide on her own when to take her break (15 minutes for every four hours worked), safety permitting (Huber Dep. II 50–57). This is not the stuff of which intolerable conditions can be construed, no matter how the inferences are drawn.

### 4. Verbal Abuse

■ Another aspect of White's harassment claim is that she was assertedly subjected to verbal abuse. She contends (Mem. 11) that she was at times "cursed out" and that one of her supervisors, Stathis, was "abrasive" towards her (White Dep. 109, 205–06; Cox Dep. 24). In White's words, she was "berated and cursed, by management and co-workers despite the knowledge that she was deeply religious" (White Mem. 2).

Even if White's supervisors were not immune to losing their tempers on occasion, that would scarcely equate to intolerable working conditions. Anger is not surprising where employees undertake dangerous tasks and deal with hazardous chemicals, so that any lapse may threaten everyone's personal safety. And the way White tells it, the yelling often corresponded to mishaps occurring while she was on the job (White Dep. 44–45). In sum, White's limited citations to the record on this point do not show (even with the required favorable inferences) that any rebukes were either frequent or grossly disproportionate.

Moreover, White clearly does not derive the mileage she seeks from her religiously-motivated disdain for the foul language of her co-workers and supervisors (see, e.g., the argument at White Mem. 11 that Dial management was aware that Stathis "curs[ed]" her). While her personal inhibitions against

swearing are obviously her own business (White Dep. 5), White's special sensitivity is not enough—she must also satisfy the required objective standard (Harris v. Forklift Sys., Inc., —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (evaluation must be made not solely from the perspective of the particular plaintiff, but also from that of the traditional "reasonable person")). And that she has not done.

■ Although that part of White's verbal-abuse contention is thus wholly without merit, another aspect—her charge (Mem. 2) that "she was continually reminded by management and co-workers that the A–5 Operators's [sic] position was 'not a woman's job' and that she should return with the women to the Soap Finishing Department"—is more serious, constituting one of White's few potentially meritorious arguments. Yet White's submission does not offer up even a single record citation of specific evidence supporting that accusation. Instead her *only* (and unsupported) reference to the "women's job" comments is in her Memorandum's introductory summary paragraph (White Mem. 2), where it stands alone without substantiation from the record.[19]

Under those circumstances, it is highly questionable whether this Court had the obligation to bail out her counsel's delinquency by combing the 500–plus pages of White's transcript for possible support for that claim. Fortunately for White, however, Dial has directed this Court to the relevant passages.

First, it appears that Beach may have spoken to White in a fashion that she perceived as reflecting his view that work as an A–5 Operator was not a woman's job (Beach Dep. 43–44):

Beach: Not to sound—like I say it doesn't appear to be something that a woman should be doing. This is my own personal opinion.

Q: Did you ever say that to Shirley?

---

18. White said at her Dep. 69:
Q: So on the first night, Juan [Martinez] told you that, after the train was broken down, you could have a 15–minute break?
A: Yes.

19. One of White's citations to Beach's deposition does include his discussion of whether he believes the A–5 Operator job to be appropriate for women, but White does not identify the cite as such in the text of her Memorandum.

A: Yes, but not in a derogatory sense, it was just a means of expressing my opinion. I did not say that she couldn't do it, because Arlene [Dougherty] does it.

Q: Did you ever hear anyone else say that to Shirley?

A: Possibly, but it wasn't meant in a derogatory. It was just like when she first came out there it's required that you wear pants because you are up and down rail cars and you are stooping and squatting and doing a lot of lifting.

Her religious convictions require her to wear dresses all the time which made it very hard to climb up and down the side of those cars, especially on a windy day.

But my own personal opinion didn't alter the fact that when she needed help me not helping her, because I felt that if she wanted to try or felt she wanted to be out there I was obligated to help her.

Similarly, several statements to the same effect have been attributed to Martinez (e.g., White Dep. 406–07):

I couldn't get a bolt off the thing, a nut off, and he [Martinez] said this is not a woman's job. You know, like if you can't get it open, because I'm not strong enough to open it, then it's not a—that—this I want to say how he said it. I told him I couldn't get the bolt off.

\* \* \* \* \* \*

He said that, you know, if you are too weak or something like that, go back to soap finishing where the womens were.

---

**20.** Various A–5 operators testified that the job entailed a great deal of strenuous lifting and other physical effort and that White is a "small framed woman" (see, e.g., Beach Dep. 96). But Dial makes no attempt to argue that White was unqualified on a personal (not sex-related) basis.

**21.** Moreover, to the extent that White attempts to implicate Dial in the wrongdoings of its employees, she has wholly disregarded her burden of demonstrating some sort of fault on the part of Dial itself. Thus *Saxton v. A.T. & T. Co.*, 10 F.3d 526, 535 (7th Cir.1993) recently reconfirmed that employer liability under Title VII is judged not in respondeat superior terms but by a standard more closely resembling negligence: Liability for an employee's tort against co-workers attaches "only if, knowing or having reason to know of the misconduct, the employer unreasonably fails to take appropriate corrective action."

In addition to bringing the Martinez incidents to this Court's attention, Dial has assisted White's presentation of the facts by noting her accusation that another man who trained her, Stathis, engaged in analogous affronts (White Dep. 409, 202–12).

It will be assumed here that there is no legitimate sex-based disqualification of any woman to serve as an A–5 Operator, and that White herself was not individually unqualified for the job.[20] But the just-quoted and just-referred-to statements directed to White by her fellow workers cannot give rise to Dial's liability under Title VII without the missing showing that they made her work environment intolerable (see *Darnell*, 16 F.3d at 178–79), particularly since the offenders *were* fellow employees and not White's supervisors. In that respect *Young In Hong*, 993 F.2d at 1266 confirms that to survive summary judgment a plaintiff must prove a nexus between the offensive remarks and her employer's "decisional process"; indeed, *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1308 (7th Cir.1989) teaches that even the acts of supervisors will not automatically be attributed to an employer for purposes of a Title VII claim. Dial cannot fairly be held responsible for the views of its operators unless White can show that her working conditions were rendered intolerable by abuse. And that she has not done.[21]

As for the one Dial supervisor whose behavior has been implicated in any respect, White admits that Huber never made any such "It's not a woman's job" comments.[22]

---

**22.** White testified (Dep. 334, 338):

Q: Were there any other conversations that you can recall prior to April 17th when you bid out of the position where Mr. Huber told you that the A–5 job was not a woman's job?

A: Well, no, he didn't tell me that it wasn't a woman's job. There was other incidents. But I don't remember him saying that it's not a woman's job anymore. I don't remember him saying that.

\* \* \* \* \* \*

[After White's description of Huber's non-sex-oriented criticisms:]

Q: Were there any other incidents that you can recall where Mr. Huber made any comments to you about the A–5 position not being a women's job?

A: Like I said, I don't think so. I don't remember.

Instead, White Mem. 11 tries to paint him as "abrasive" to the point that any reasonable employee would have felt compelled to transfer.[23] But the record reveals that claim too is without merit, for White has failed to bring to this Court's attention any evidence that, if credited, would create a material issue of fact requiring resolution by a factfinder—a conclusion that flows a fortiori from such cases as *Harris,* —— U.S. at ——, 114 S.Ct. at 370 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview") and *Saxton,* 10 F.3d at 534 (while a supervisor's offending "conduct was undoubtedly inappropriate, it was not so severe or pervasive as to create an objectively hostile work environment").

In short, it may be assumed that White's working conditions were less than amiable, but the circumstances simply do not provide a sufficient basis for a constructive involuntary transfer claim. What this Court said in *Phaup v. Pepsi–Cola General Bottlers, Inc.,* 761 F.Supp. 555, 570–71 (N.D.Ill.1991) (citations omitted) applies here with equal force:[24]

> According to *Rutan v. Republican Party of Illinois,* 868 F.2d 943, 950 (7th Cir.1989) (en banc) (citations omitted), *rev'd on other grounds,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), the focus in constructive discharge cases is whether a reasonable person in plaintiff's position would feel compelled to leave her job:
>
> > In the course of most, if not all, people's employment a wide variety of disappointments, and possibly some injustices, occur. Most of these are normal incidents of employment that would not lead a reasonable person to quit.

In other words, "[a]n employee may not be unreasonably sensitive to his working environment."

Plaintiffs' claims that Reese was hostile are precisely the kind of "disappointments" (or even, though that has not been established here, "injustices") that reasonable people endure on the job—mean stares, criticism of performance, and now and then an unfortunate statement such as that a person is too heavy for the job. None of those—either separately or combined—creates or create working conditions so intolerable as to force a reasonable person to quit. Even if Reese were "a heavy-handed manager who dealt poorly with subordinates[, t]hat kind of manager is (unfortunately) not a rare breed, and simple mismanagement does not constitute constructive discharge."

Although the working conditions reflected in the record may not have been pleasant, they were not so intolerable as to force a reasonable person to quit.

### *Sex-discriminatory Treatment*

 White's demonstrated inability to show that she was "constructively involuntarily transferred" is fatal to her claim. But independently of that failure, her claim also founders because she cannot establish the fourth element of her prima facie case: that she was discriminated against on the basis of her sex. In that respect *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir.)

So the assertion by White's counsel (Mem. 2) that she was "continually reminded by management" that hers was not a woman's job is yet another example of a patently unsupported statement.

**23.** Apparently just about everybody in the Department has problems in getting along with Huber (Beach Dep. 67). As *Darnell,* 16 F.3d at 179 teaches in a far more serious context, a finding of constructive discharge is inappropriate where plaintiff's boss was "mean and degrading to all employees she supervised."

**24.** *Darnell,* 16 F.3d at 179 is also instructive as to another flaw in White's case:

> Finally, even if Darnell had succeeded in showing that he was constructively discharged, he failed to present any evidence that he had sought legal redress before resigning, as required by *Brooms.* To avoid this requirement, the plaintiff must show that the discrimination against him was "aggravated." However, his failure to show constructive discharge inevitably shows that he has failed to make the more difficult showing needed for his claim to go forward when he sought no legal redress before resigning.

That failure on White's part—and it is undisputed—would be an independent ground for rejecting her claim.

(citations omitted) has recently sought to dispel any existing confusion as to the different approaches for establishing a claim of willful discrimination:

Different kinds and combinations of evidence can create a triable issue of intentional discrimination ("disparate treatment," in the jargon of discrimination law), the only kind of discrimination alleged in this case. One kind is evidence that can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents. Such evidence is indeed direct evidence as distinct from circumstantial; and since intent to discriminate is a mental state and mind reading not an accepted tool of judicial inquiry, it may be the only truly direct evidence of intent that will ever be available. But circumstantial evidence is admissible too, to provide a basis for drawing an inference of intentional discrimination.

Three types of circumstantial evidence of intentional discrimination can be distinguished. The first consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. This is the most common type of evidence in an intentional discrimination case, now that employers have taught their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written. Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment. And third is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination. Each type of evidence is sufficient by itself

(depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together.

Here White tries to support her charge with several lines of circumstantial argument. None has merit.

To begin with, this opinion has already examined White's claims of differential distribution of breaks and safety training, demonstrating that White had no facts to substantiate her allegations of inequitable (much less discriminatory) treatment in any of those respects. And most crucially for the issue now under discussion, no evidence at all even suggests that similarly-situated males were dealt with more favorably (see *Weiss v. Coca–Cola Bottling Co. of Chicago,* 990 F.2d 333, 338 (7th Cir.1993)).

White's mundane-task argument is similarly untenable. Her Mem. 7 posits that "she was relegated to performing tasks not assigned to her male counterparts," but inspection of the numerous record pages that she cites uncovers just two contentions: that she alone was made to clean up the "Hydro Building" and that no one had to "stay out all night washing down the tracks but me" (White Dep. 276–77). As for the first of those assertions, it is simply left hanging in empty space without any clarification. As to the second, hosing railroad tracks is within the expected duties of any A–5 Operator (male or female) to begin with (see, e.g., Beach Dep. 95; Cox Dep. 32). And as for her charge that she was made to stay late to finish that chore, the record establishes that each employee was given a set amount of tasks calculated to last the entire shift[25] (Huber Dep. II 52; Stathis Dep. 38)—by definition, then, the work obviously could take longer if an employee (particularly a new one) worked slower than expected (*id.* as to both the foregoing record references). Finally, White's failure to flesh out her charge (by identifying the frequency of occurrence or magnitude of the claimed inconvenience) further vitiates an already inadequate claim.

---

**25.** Nowhere in White's Complaint or Memorandum does she contend that she was assigned a

disproportionate amount of work.

That leaves as White's only potentially viable foundation for a discrimination claim the idea that she was denied pay increases that should have accrued as a result of her purportedly expanding skills.[26] White Aff. ¶ 4 states that supervisor Huber never gave her a raise beyond her base training rate of $13.79, and her Mem. 8 asserts that such deprivation was unlike the treatment accorded to similarly situated males. On that latter point White points to Cox, who testified that he received three salary increases during his first 90 days as an A–5 Operator (Cox Dep. 32–35).

But that comparison, even when buttressed by the required favorable inferences, does not do the job. Perhaps most significantly, White and Cox are really not comparable. Cox's training (by a man who has since died, Bruce Uhl) had taken place back in 1986 (Cox Dep. 7). And between Cox's and White's training dates, the practice as to raises had changed: Other employees who had been trained in the interim period testified that for them the training rate had been supplanted by the higher rate "all at once" when they completed training (Beach Dep. 23):

> Beach: [T]here's a training rate and then once you proved yourself to be qualified then you get the full rate.
> Q: Did you get the full rate all at once or did you get the full rate based upon your ability to operate different machines?
> A: They give it to you all at once.

Accord, Martinez Dep. 16–18.

No adversely discriminatory treatment of White was even hinted at under that more recent practice. At Dial individual supervisors are vested with the discretion to determine when an employee merits a raise based on increased mastery of the job (Huber Dep.

II 10–11). Training periods are not set at any standard length—they end only when a person learns the job (id. 27–28).[27] Martinez testified that from the time he started working it took him "several months" to become fully qualified (Martinez Dep. 17–18),[28] and Beach said that Louis Trevino did not receive the fully-qualified rate for "three or four months" (Beach Dep. 65).

In this instance White was told by her supervisor that she was not entitled to the raise because she had not yet attained the requisite proficiency in all aspects of the job (White Dep. 248). White's self-serving declarations of competence to the contrary, Huber testified at length that she never became fully proficient at her job in the ten or so weeks that she spent as an A–5 Operator (Huber Dep. I 83–84):

> I don't believe she did a lot of blend loading, fatty acid loading, pitch loading, bottoms loading, emptying rear cars into tank wagons, preparing cars for cleaning, and I don't believe she accomplished a lot of caustic loading.
>
> * * * * * *
>
> [S]he had not done a great deal of [pumping from tank to tank], she was still in the training process.

Huber also said that White remained a trainee because she never mastered operation of the carbon cells (id. 90) and that she was responsible for certain errors (he stated, id. at 91, that White's "improper valving" allowed water into the cells), and White Dep. 288–92 confirms that she was told she was not ready for a raise for that reason; (cf. Beach Dep. 90).

Nor is this a case where it is White's word against Huber's. Indeed, White (who acknowledges that she was not trained on the centrifuge, Dep. 253, 456[29]) as much as ad-

**26.** White's Mem. 2 (its summary paragraph) advances the additional accusation that "she was denied the opportunity to work overtime, unlike her male counterparts," but White offers no supporting citation and never mentions it again in her submissions.

**27.** P. 12(m) ¶ 11 acknowledges:
A–5 Operators to become fully qualified were required to grasp all components of the job and be able, when needed to perform all tasks associated with said job. (See generally, Stathis Dep. Tr., Cox Dep. Tr., Beach Dep. Tr., Martinez, Dep. Tr.)

**28.** Like White, Martinez received no raises during his training period.

**29.** Although White claims to have been denied access to that training, it is plain that a trainee had to master the more basic tasks before progressing to advanced skills like the centrifuge.

mits that she was not qualified to receive a raise (*id.* 455–56, emphasis added):

Q: And did you ever see a chart which indicated the scales that you were supposed to master within the A–5 job classification *before you received interim increases leading up to the fully qualified rate?*

A: Yes....

\* \* \* \* \* \*

Q: Do you recall what skills you were supposed to master before your received an increase?

A: Yes.

Q: What skills were those?

A: You had to master the track, *the centrifuge building,* which you call pre-treatment building, and the carbon and the caustic. I think that was the only four.

There is simply no occasion to second-guess Huber's fully-supported determination as to White's degree of proficiency. And White is wrong in saying (Mem. 8) that "Defendant on page 14 admits in its memorandum that Plaintiff was 'fully trained as proficient as A–5 Operator.' " That obviously distorts Dial's memorandum statement, which focuses only on the length of time that male employees required to reach that level of proficiency.[30] Indeed, on that same page 14 Dial's memorandum stressed that Dougherty—and *not* White—had become fully trained.

As if all this were not enough (as it is), White has completely failed to tie the conduct under examination with any discriminatory animus on the part of Dial. That is, even if this Court were to make the unjustified assumption that White *was* unjustly denied raises, nothing whatever links that denial to prejudice on the basis of her sex. For example, Dougherty (who also works under Huber, his Dep. II 65) successfully qualified as a female A–5 Operator and thereafter received numerous raises after White had left (D. Ex. B at 0000136–39). Moreover, a number of males (Rodriguez and Joe Renzetti, among others) tried the job and (like White) found it disagreeable enough to bid off before they became fully qualified (White Dep. 377–84); Huber Dep. II 73–79).

Thus White has not even generated a colorable inference that she was the subject of sex discrimination. That failure alone would be fatal to her claim. And so, as this Court summarized before it entered into the substantive discussion in the *Adverse Employment Action* section of this opinion, White has struck out on each of two necessary components of her prima facie case.

### Conclusion

This opinion has devoted a good deal more attention to White's contentions than her submissions might have merited. But even with that careful scrutiny, it is apparent that there is no genuine issue of material fact and that Dial is entitled to a judgment as a matter of law. This action is dismissed with prejudice.

---

**30.** That statement provided objective support for Huber's testimony (and White's admission) that White did not become fully trained in the shorter period that she worked at the job.